# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA
*ex rel.* SallyJo Robins, Kathleen Dunlap,
Germano Lima, and Roberto Rabassa,

           Plaintiffs,

v.

LINCARE, INC. and LINCARE HOLDINGS,
INC.,

           Defendants.

Civil Action No.
1:10-cv-12256-DPW

## RELATORS' RULE 56.1 STATEMENT OF FACTS

**RELATORS SALLYJO ROBINS,
KATHLEEN DUNLAP, GERMANO
LIMA, AND ROBERTO RABASSA**
By their attorneys,

GREENE LLP
By: /s/ Thomas M. Greene
Thomas M. Greene, Esq. (BBO No. 210020)
tgreene@greenellp.com
Michael Tabb, Esq. (BBO No. 491310)
matabb@greenellp.com
Elizabeth Cho, Esq. (BBO No. 672556)
One Liberty Square, 12th Floor
Boston, MA 02109
(617) 261-0040

Dated:  November 21, 2016

HODGSON RUSS LLP
By: /s/ Daniel C. Oliverio
Daniel C. Oliverio, Esq. (*pro hac vice*)
John L. Sinatra, Jr., Esq. (*pro hac vice*)
Reetuparna Dutta, Esq. (*pro hac vice*)
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, New York 14202
(716) 856-4000

Dated:  November 21, 2016

Pursuant to Federal Rule of Civil Procedure 56(c) and Local Rule 56.1, Relators SallyJo Robins, Kathleen Dunlap, Roberto Rabassa, and Germano Lima (collectively, "Relators") submit this Statement of Facts in Opposition to Lincare, Inc.'s ("Lincare") and Lincare Holdings, Inc.'s ("Holdings") motion for summary judgment.

## THE PARTIES

1.    SallyJo Robins is a resident of Buffalo, New York.  Decl. of SallyJo Robins ¶ 1.  She was employed by Lincare for approximately 17 years at its Amherst, New York billing facility and Hamburg, New York office.  *Id*.  Her most recent position was as a Direct Pay Accounts Receivable Supervisor.  *Id.* ¶ 3.  Robins once worked in Lincare's Medicare/Medicaid billings area as a supervisor.  *Id*.  Robins was Kathleen Dunlap's supervisor when Dunlap was employed by Lincare.  *Id*.  Robins was wrongfully terminated by Defendants in June 2013.  *Id*. ¶ 4.  *See also infra* at ¶¶ 154 to 169.

2.    Kathleen Dunlap is a resident of Tonawanda, New York.  Decl. of Kathleen Dunlap ¶ 1.  She was a Lincare Direct Pay Customer Account Representative from 2003 to 2010.  *Id*.  She was wrongfully terminated by Defendants in July 2010.  *Id*.  *See also infra* at ¶¶ 170 to 193.

3.    Germano Lima is a resident of Marlborough, Massachusetts.  Decl. of Germano Lima ¶ 1.  He was a Lincare employee from 2006 to 2010, and he worked in Lincare's Marlborough, Massachusetts center.  *Id.* ¶ 2.  Lima was wrongfully terminated by Defendants in June 2010.  *Id.  See also infra* at ¶¶ 194 to 217.

4.      Roberto Rabassa is a resident of Worcester, Massachusetts.  Decl. of Roberto Rabassa ¶ 1.  He was a Lincare employee from 2004 to 2009.  *Id.* ¶ 2.  He worked in Lincare's Worcester and Townsend centers and also with Relator Lima in the Marlborough center.  *Id.*  Rabassa was wrongfully terminated by Defendants in October 2009.  *See id.* ¶ 2.  *See also infra* at ¶¶ 218 to 236.

### LINCARE'S STRUCTURE

5.      Lincare is organized by centers, areas, and regions.  *See* Robins Decl. ¶ 5. Each local service office is considered a "center" and approximately 8 to 10 service centers comprise an "area."  *Id.*

6.      Each center has a center manager who reports to an area manager.  *See* Gangemi Dep., at 20:1-17, 23:19-23, 24:1, Ex. 13.[1]  Area managers report to a regional or district manager, and the regional and district managers report to officials at Lincare's corporate headquarters in Clearwater, Florida.  *Id.* at 23:19-23, 24:1-17; *see also* White Dep., at 25:17-23, Ex. 40.  Between 2005 and 2014, all regional managers for Lincare's oxygen centers reported to one of two Lincare vice presidents, either Gregory McCarthy or Peter Mosby.  *See* McCarthy Dep., at 9:17-10:2; 14:12-16:18, Ex. 25.

7.      Center managers receive a compensation package that is substantially dependent on their ability to meet oxygen revenue and profitability targets established by senior Lincare executives.  *See* Dillon-Sarra Dep., at 123:11-25, Ex. 10; DelBiondo Dep., at 82:24-25, 83:1-10; 87:1-18, Ex. 8.  District and area managers similarly receive incentive compensation

---

[1]      Unless otherwise noted, all references to "Ex. __" cited in this document are to the November 21, 2016 Declaration of Michael Tabb in Opposition to the Defendants' Motion for Summary Judgment.

based on their areas of control exceeding an earnings threshold every quarter.  Traylor Dep., at 16:14-17:12, as Ex. 37.  These managers could make more than 50 percent of their yearly compensation from incentive bonuses and, in some instances, district and area managers received stock options based on their performance.  *Id.* at 21:7-24; 53:1-15.

8.      Lincare closely tracked the number of oxygen customers — *i.e.*, customers who rent oxygen equipment, such as oxygen concentrators or portable oxygen equipment — serviced by each center.  Lincare expected that every center's roster of oxygen customers would expand, and center managers were expected to meet monthly quotas for treating these customers.  *See* Ambrosino Dep., at 163:9-24, Ex. 2; Bennett Dep., at 233:24-234:11, Ex. 3.

9.      Center Managers are evaluated on the number of current oxygen customers serviced by their center.  *See* Gangemi Dep., at 118:8-16, Ex. 13; McCarthy Dep., at 127:2-6, Ex. 25.  Each month, center managers report their "number" — the number of current oxygen customers — to their supervisors.  Center managers whose monthly numbers do not regularly increase will be removed.  Center managers whose numbers are lower than the prior month are in danger of being terminated.  *See* Filo-Loos Dep., at 183:5-184:23, ("If you were a center manager that did not grow your branch, you wouldn't be a center manager for very long.") Ex. 12; Walker Dep., at 57:13-58:3,  Ex. 38; Adams Dep., at 41:13-17,  Ex. 1; Traylor Dep., at 177:8-13 (management sometimes refused incentive pay if concentrator check percentage not high enough), Ex. 37.  Lincare knew that its incentive regime placed pressure on center managers to grow their customer base because employees expressed concern about the pressure to produce numbers over the course of investigations.  Hite Dep., at 152:1-5, Ex. 17; Ambrosino Dep., at 163:9-24, Ex. 2.

- 3 -

10.     Lincare's compensation system provides incentives for the center manager to encourage other employees to violate federal Medicare rules and regulations, as well as Lincare's own policies, to increase oxygen sales (and the manager's compensation).  *See* DelBiondo Dep., at 88:4-25, 89, Ex. 8; Adams Dep., at 38:21-25 ("Center managers are — performance are measured by their growth, their oxygen growth, among other things."), Ex. 1; Hite Dep., at 68:19-25, 69, 151 ("the centers are ranked on O2 growth"), Ex. 17.

11.     Lincare's centers are supported by several dozen regional billing and collection offices ("RBCOs"), which perform Lincare's billing and reimbursement functions. *See* Klak Dep., at 10:23, 11:1-3, Ex. 18.

12.     Each RBCO is responsible for the service centers in corresponding operational regions.  *See* Robins Decl. ¶ 6.

13.     The RBCOs are composed of separate departments, all tasked with ensuring that Lincare is billing appropriately.  *Id.* ¶ 7.  The "Direct Pay" unit is responsible for processing billings to customers, as in the case of co-insurance or deductible payments.  Other units bill Medicare, Medicaid, and private insurance payors.  *Id.*

14.     Through its RBCOs, Lincare electronically bills Medicare from Lincare's central computer system.  *Id.* ¶ 8.  Once a Medicare beneficiary who receives oxygen service from Lincare is set up on Lincare's billing system, Medicare is automatically billed electronically for equipment rental on a monthly basis.  Billing for such services only stops if the customer's Medicare benefits are capped (*see infra* at ¶ 97) or if someone at a Lincare RBCO

terminates the billing by inactivating the account or by entering into the system that the rental equipment has been picked up.  Robins Decl. ¶ 8.

15.     Lincare's RBCOs relied on receiving paperwork from the centers (often called a "ticket") as to when a customer should be "inactivated," thereby halting the relevant billing to the customer and to third-party payors, including Medicare and other government programs.  *Id.* ¶ 9; *see also* Makey Dep., 85:17-22, 211:17-25, 212, 213:1-19, Ex. 24; Gangemi 11/18/2015 Dep., at 101:4-23, Ex. 13.

## LINCARE'S PRACTICE OF FRAUDULENTLY BILLING AFTER PICKING UP EQUIPMENT

16.     Lincare has an ongoing problem with billing for equipment that it has already picked up.  *See* Sweet Dep., at 159:6-9, Ex. 35; Makey Dep., at 92:13-23, Ex. 24; Little Dep., at 123:12-14 ("I know it's one of their top compliance concerns[.]"), Ex. 22; Hite Dep., at 68:3-68:24, Ex. 17.

17.     Lincare service representatives, who work in the field, routinely complete paperwork regarding deliveries, equipment status, and customer terminations by using paper "tickets," which are to be filled out in triplicate.  *See* Makey Dep., at 84:13-24, 85:11-25, Ex. 24; Klak Dep., at 16:12-17, Ex. 18.  They deliver these tickets to their center's office, and the center manager is responsible for making sure the tickets are sent to the RBCOs on a daily basis.  In this way, the RBCO is supposed to learn about customers who have died, left their homes for hospitals or nursing homes, have had their equipment picked up or have otherwise ceased using their equipment and/or terminated service.  *See* Hite Dep., at 29:20-25, 30:1-12, 138:15-18, Ex. 17; White Dep., at 39:18-23, 40, 41, Ex. 39.  All of the events listed above are grounds for

immediately ceasing billing.  If billing to Medicare or any other government payor continues

after any of these events, Lincare is improperly billing for services that are not reimbursable.  If

Lincare continues to bill after equipment has been picked up, it is billing for service it never

rendered.  Robins Decl., ¶ 10.

18.     Although tickets are supposed to be sent from the centers to the RBCOs

daily, in practice there is frequently a lag between the date of the ticket discontinuing or

inactivating all or a portion of the customer's equipment and the date of billing cessation.

Gangemi Dep., at 107:14-21, Ex. 13.  The lag between the event which should have terminated

billing and the processing of the ticket with the relevant information may be lengthy, which will

lead to continued billing during periods of non-use.  *See* Traylor Dep., at 281:14-17, Ex. 37;

White Dep., at 42:5-14, Ex. 39; Smith Dep., at 19:16-23, 20, 21:1-19, Ex. 34.

19.     Lincare knew that one of the principal reasons for delays in the

processing of inactivations was because center managers instructed their subordinates to delay

picking up equipment or to delay transmitting their pickup tickets to the RBCOs.  By deliberately

not reporting inactivations or equipment pickups until after the end of the month, centers'

monthly "numbers" appeared to be higher than they really were.  *See* Tettis Dep., at 32:13-34:3,

Ex. 36; Dillon-Sarra Dep., at 123:6-25, 124:9-16, Ex. 10; Bennett Dep., at 54:9-24, Ex. 3;

DelBiondo Dep., at 83:2-17, 88:20-24, Ex. 8; Makey Dep., at 103:10-22, Ex. 24.

20.     In fact, this was a common practice among Lincare employees to allow for

additional billing to occur.  *See* White Dep., at 42:9-21, 59:5-13, Ex. 39; Tettis Dep., at 32:13-22,

Ex. 36; Bennett Dep., at 54:21-22, 55:11-22, Ex. 3; Makey Dep., at 92:13-23 (complaints of

holding pick-up tickets every two weeks), Ex. 24; Robins Decl. ¶ 10 (asked by Lincare center representatives to allow billings to continue until month's end to enable them to earn additional commissions).

21.     Employees at all levels within Lincare — from customer service representatives and service representatives at individual centers to Vice Presidents of Operations for the entire company — recognized that Lincare had a continuous and ongoing problem with centers holding pickup tickets and the company promptly processing billing inactivations.  *See e.g.*, Hite Dep., at 68:3-69:15, Ex. 17 (Lincare's compliance department knew holding tickets was a top five compliance issue) (testimony of Compliance investigator); Bennett Dep., at 53:16-55-9, Ex. 3  (center managers held pickup tickets to boost their oxygen growth numbers) (testimony of compliance investigator); Bennett Dep., at 119:13-120:10, Ex. 3 (pickup report showing that 60 percent of customers' inactivations were delayed); Ambrosino Dep., at 162:7-22, Ex. 2 (there were rumors that center managers held pickup tickets to improve their numbers) (testimony of former center manager); Morand Dep., at 55:12-56:4, Ex. 26 (testimony that a center manager would delay picking up equipment from customer who had died) (testimony of service representative); Smith Dep., at 25:15-27:16, Ex. 34  (report showing around 200 customers who were billed after their inactivation); Dillon-Sarra Dep., at 235:22-236:22, Ex. 10 (center managers manipulated their oxygen statistics by choosing which tickets got processed) (testimony of compliance investigator); McCarthy Dep., at 97:1-7, Ex. 25 (vice president knew that centers held pickup tickets) (testimony of vice president); Rabassa Dep., at 98:20-99:14, Ex. 31 (relator witnessed center managers holding pickup tickets and delay their transmission to the RBCO); Lima Dep., at 106:5-107:15, Ex. 21 (inactive customers remained on the actively billed

- 7 -

"concentrator checklist," after relator informed superior that customer should be removed); Tettis Dep., at 30:5-31:19, Ex. 36 (instructed by center manager to hold pickup tickets) (testimony of former customer service representative); Walker Dep., at 167:6, Ex. 38 (testimony of former center manager); Pedersen Dep., at 118:22-120:7, Ex. 28 (testimony of Lincare compliance officer).

22.     Lincare's Compliance Department was well-aware of this problem. Lincare's 2012 compliance training PowerPoint acknowledges that holding pickup tickets is its #1 compliance violation.  *See* Ex. 197 (LINCARE0016143-60, at 9).

23.     And Lincare compliance investigator Deborah Dillon-Sarra expressly acknowledged to Robins that Lincare's compliance department "know[s] that [service centers failing to inactivate accounts in a timely manner] is a problem." Ex. 214 (LINCARE0194196-98).

24.      Lincare's Compliance Department found pickup ticket holding across the company in all geographic areas.  Some of the centers where Lincare compliance officers performed investigations and found pickup ticket holding and improper processing of inactivations were Mexico, Missouri, Ex. 111 (LINCARE0054575) (22 of 125 patients had tickets held into following month in 2007); Worcester, Massachusetts, Ex. 154 (LINCARE 0206970) (2008); Meriden, Connecticut, Ex. 169 (LINCARE0254121) (2008); Grand Rapids, Michigan; Rockford, Illinois; Johnson City, Tennessee; and Phoenix, Arizona, Ex. 204 (LINCARE0054205) (finding intentional ticket holding in these offices in 2007); La Junta, Colorado, Ex. 99 (LINCARE0011604) (2010); Las Cruces, New Mexico, Ex. 228

(LINCARE0244229) (2008 – 9.2% of accounts were billed after pickup occurred requiring a

refund); Newman, Georgia, Ex. 123 (LINCARE0054848) (2008); Blue Springs, Missouri, Ex.

157 (LINCARE0212168) (2009); Havre, Montana, Ex. 160 (LINCARE0217590_0007-8)

(2010); Clarkson, Washington, Ex. 160 (LINCARE0217590_0013-14) (2010); Watsonville,

California, Ex. 160 (LINCARE0217590-0022-23) (2010); Frankfort, Kentucky, Ex. 149

(LINCARE0196923) (center manager who instructed staff to hold pickup tickets was not

terminated because conduct had stopped); Watertown, New York, *see*, Ex. 223 (LINCARE

0236966) (holding pickup tickets treated as paperwork processing, instead of compliance issue in

2009); Torrington, Connecticut, Ex. 230 (LINCARE0252922 (17% of accounts billed after pick-

up in 2008); Glastonbury, Connecticut, *see*, Ex. 110 (LINCARE0053915) (96% of accounts held

longer than 7 days into next month); various locations in Connecticut, *see*, Ex. 227

(LINCARE0238003-06) (locations improperly billing after pick up as frequently as 58% to 60%

of the time in 2008); Lenox, Massachusetts, Ex. 227 (LINCARE0238022) (2008 document

showing 25 of 213 accounts billed after pickup); East Hampton, Massachusetts, *see* Ex. 227

(LINCARE0238024) (2008 document showing 59 of 147 accounts billed after pick up);

Saginaw, Michigan, Ex. 149 (LINCARE0196908) (location held almost 48% of pick-up tickets

in 2009); Ohio, *see* Ex. 216 (LINCARE0198805-7) (center manager in 2010 telling employees

not to inactivate billing until manager gives "green light"); Yakima, Washington, *see*, Ex. 156

(LINCARE0210449) (despite training, center had no process to ensure timely inactivations,

leading to held pick-up tickets in 2011); Naples, Florida, *see* Ex. 199 (LINCARE 0016334) (14%

error rate as to pick-ups in 2012);  Fletcher, North Carolina, *see* Ex. 101 (LINCARE0014267)

("very large break in the system" led to 19% hold rate in 2013); Idaho center, Ex. 219

(LINCARE0206323) (compliance department identified 9% hold rate, remarked that "it seems that the center if doing the # game is hiding it well"); Hannibal, Missouri, Ex. 116 (LINCARE0054806) (33 of 165 patients billed after pickup); Norwich, Connecticut, Ex. 224 (LINCARE0229950) (23 of 76 patients billed after pickup); Stockton, California, Gangemi Dep., at 123:5-22, as Ex. 13; Connecticut, Gangemi 30(b)(6) Dep., at 10-17, Ex. 14.

25.     Rabassa and Lima, who were service representatives at Lincare's Marlborough Massachusetts center, personally observed that many of their center's customers' accounts were not promptly inactivated notwithstanding the fact the customer was deceased, in a skilled nursing facility, or had their equipment picked up.  On a monthly basis, Rabassa and Lima were assigned to do concentrator checks, and they reported to their center that the customers were deceased or otherwise not using oxygen.  Nonetheless, those customers' names would remain on the monthly concentrator check list, which contained only active billing accounts, meaning that Lincare continued to bill these customers' accounts after Rabassa and Lima notified it that an event had occurred, such as death of the customer, which required billing to stop.  *See* Rabassa Decl. ¶¶ 3, 4.

26.     In a conversation just before she left Lincare, Lincare's Center Manager Heather Walker informed Rabassa and Anne-Marie Tettis that Lincare knew that center managers, in order to keep their oxygen number high, intentionally kept deceased customers on their active lists in order to qualify for incentive compensation awards.  *See* Rabassa Dep., at 155:18-157:24, Ex. 31.

27.     In November 2008, Lincare's compliance department investigated whether the Marlborough center was improperly holding tickets and failed to stop billing. It found that 44% of inactivation tickets were held after the close of the month and there was billing after pickup on 24% of the accounts. *See* Ex. 223 (LINCARE0229317). Heather Walker informed the former manager for the center, and the former area manager for Area 33, Mary Sweet, who told her to hold inactivation tickets. *See* Ex. 222 (LINCARE0229262); Bennett Dep., at 222:25-223:18, Ex. 3. Notwithstanding the direct allegation that an area manager instructed center employees to hold tickets, Lincare never investigated other centers under than area manager for held tickets and improper billings. *Id.*

## DESPITE WIDESPREAD PROBLEMS WITH BILLING AFTER PICK UP, LINCARE'S REFUND PROCESS WAS UNABLE TO IDENTIFY AND CORRECT OVERBILLINGS

28.     Lincare's refund process does not correct for the widespread problems with overbilling. Specifically, Lincare's internal overpayment refund process is cumbersome and time consuming. *See* Phenis Dep., at 204:23-25, 205:1-20, 233:10-234:7, Ex. 30. The process involves multiple steps and the approval of multiple individuals. *Id.* at 233:10-24. Moreover, the process is far too time consuming for a "high-volume shop and high-volume operation" like Lincare. *Id.* at 233:25, 234:1-7. Lincare's National Reimbursement Manager, Philip Phenis, asked repeatedly for the process to be streamlined, but Lincare did not address the issue. *Id.* at 205:10-20.

29.     Significantly, even when its information system knew that Lincare issued a bill after an inactivation date or an equipment pickup, the system did nothing to alert the RBCOs of the need to investigate an improper bill — Lincare's billing system "isn't

programmed that way" and depended on manual discovery by the Collectors.[2]  Phenis Dep., at

203:5-10, 215:1-10, Ex. 30; Hite Dep., at 133:19-134:11, Ex. 17.

30.     So, Lincare was supposed to have a manual process in place that identified

all inactivations or equipment pick-ups that had been delayed and refunded any wrongfully billed

amounts.  Thus, when an RBCO received notice that billing for a customer's equipment should

have stopped weeks or months ago — whether notice to the RBCO had been deliberately or

innocently delayed—in theory there was a process that should have refunded all money

incorrectly billed.  Robins Decl. ¶ 19.

31.     In practice, the system worked poorly.  Indeed, it was designed to be

cumbersome so that refunds could not be easily made.  *See id.* ¶ 20; *infra* at ¶ 40.

32.     Ordinarily, billing for rental equipment is halted when a service center

sends notice of account inactivation to the RBCO.  The notice includes an inactivation date,

which is the date billing is supposed to stop regardless of whether the center or RBCO actually

knew on that date whether billing should cease.  RBCOs routinely backdate inactivations; they

record as the inactivation date a date earlier than the date they actually instructed the system to

longer bill for the account.  In the inactivation process, both the date the equipment should have

been inactivated and the date the inactivation was processed are recorded in the Lincare

information system.  Gangemi 30(b)(6) Dep., at 13:12-14:2, 17:10-15, 19:20-1; 24:21-25:6;

50:4-11, Ex. 14; Robins Decl. ¶ 21.  The latter date is the RBCO "Key Date".  Phenis Dep., at

215:17-25, Ex. 30.

---

[2]       The duties of Collectors are discussed at paragraph 35, below.

33.     When inactivation reports come into each RBCO, the RBCO's accounts receivable department reviews each report to see if there has been billing on the account after the inactivation date — the date billing should have ceased.  Gangemi 30(b)(6) Dep., at 24:13-20, Ex. 14.  Careful review of this process is necessary to prevent the receipt of overpayments from Medicare and other payors.  The system automatically bills on an account's "cycle date" (the day of the month the account is billed each month), and every account has a different cycle date depending on when it was initially billed.  Phenis Dep., at 228:10-20, Ex. 30.  Improper bills for service will go out if there is a delay of only a few days when the cycle date falls between the date the billing should have stopped and the RBCO Key Date.  Phenis Dep., at 229:3- 230:4, Ex. 30.  When the delay between the RBCO Key Date and the inactivation date is more than 30 days, Lincare knows at least one improper bill has been issued because at a least one full cycle has elapsed.  Robins Decl. ¶ 22.

34.     After Medicare receives a billing notice from Lincare, it pays Lincare within 15 to 25 days.  Hermes Dep., at 198:22-199:9, Ex. 16.  Thus, Lincare could receive improper overpayments from Medicare as early as 16 days after the date billing should have stopped.

35.     When inactivations are reported to the RBCOs, Patient Account Coordinators (who are usually called "Collectors" within Lincare) are supposed to review the inactivation information to determine whether Lincare billed for oxygen services after billing should have halted.  Gangemi 30(b)(6) Dep., at 52:21-53:10, Ex. 14.  Collectors are supposed to identify all overpayments that Lincare has already received and as well as all billing that will ultimately result in overpayments if the bills are not adjusted.  Robins Decl. ¶ 23.

- 13 -

36.     The inactivation review performed by the Collectors is the only time in the billing process that Lincare attempts to identify overbilling and overpayments.  Robins Decl. ¶ 23.  If overbilling or overpayments are not detected at this point, they will not be detected unless the payor notifies Lincare of a dispute or a financial review is performed in connection with a Compliance investigation of specific center.  Gangemi 30(b)(6) Dep., at 41:3-42:19, Ex. 14.

37.     Neither Compliance nor the RBCO audit or monitor Lincare's billing after equipment pick up or inactivation to determine if Lincare, in fact, billed for services after the date billing should have been halted.  Gangemi 30(b)(6) Dep., at 42:20-43:12, Ex. 14; Pedersen Dep., at 126:14-17, Ex. 28; Smith Dep., at 25:15-23, 26:1-3, Ex. 34.

38.     Collectors are entry-level RBCO employees with limited Medicare experience.  Phenis Dep., at 212:12-16, Ex. 30.  As their job title implies, Collectors are primarily responsible for collecting accounts receivable from payors.  Although Collectors are supposed to also review inactivations and process refunds and adjustments, they focused most of their attention on collecting revenue.  They may receive incentive bonuses for collection activities, and they were only formally evaluated on how well they performed their collecting duties.  They were not evaluated on how efficiently they gave money back to the persons who were actually entitled to it.  Robins Decl. ¶ 24.  Collectors were expected to process high volumes of paper and could not, and were not expected to, spend "quality time" reviewing inactivations and pick up notices.  Phenis Dep., at 230:10-21, Ex. 30; Robins Decl. ¶ 25.

39.     When processing inactivations, Collectors ordinarily do not look at whether there had been a bill sent between the inactivation date (or equipment pick up date) and

the date the inactivations (or pick ups) were processed.  Phenis Dep., at 229:3-17, Ex. 30.  Nor

do collectors check the RBCO Key Date to see if there has been a delay of 30 or more days,

which would establish that at least one improper bill had been sent to Medicare.  Phenis Dep., at

216:1-21, Ex. 30.

40.     When Collectors identified billing that had gone out after equipment pick-

ups or inactivations, too many persons were needed to actually initiate and review a proposed

refund.  There were several more steps in the process than were necessary.  Phenis Dep., at

233:10-24, Ex. 30.  The National Reimbursement Manager, who was responsible for insuring

that revenue was appropriately collected in compliance with Medicare's requirements, repeatedly

asked for the refund system to be streamlined and improved, but his requests were never acted

upon.  Phenis Dep., at 233:10-234:7, Ex. 30.  The difficulty of the process and the high volume

of work given to the collectors discouraged efforts to identify and rectify overbilling or

overpayments.  Robins Decl. ¶ 25.

41.     Aside from attempting to identify overbilling and overpayments while

processing inactivations, Lincare's billing offices made no other efforts to find or identify

overpayments.  A known problem was continued billing after oxygen equipment had been picked

up.  However, there was no process to look for such overpayments if an equipment pickup was

not accompanied by an inactivation notice.  Robins Decl. ¶¶ 26, 27.

42.     The RBCO's processing of an equipment pick up ticket, similar to its

processing of an inactivation, should stop prospective billing on the equipment.  But unlike

inactivations, Collectors did not examine whether any billing had occurred between the actual

- 15 -

pick up and the processing of the ticket by the RBCO.  Notwithstanding the billing offices'
knowledge that some centers held tickets, without an inactivation no one examined whether
Lincare had billed after the actual pick up date. Robins Decl. ¶ 28.  Relator Robins brought this
failure to exercise proper diligence concerning the possibility of widespread billing after
equipment pickups to her supervisors' attention repeatedly, to no avail.  *Id.*

      43.     According to Lincare's Rule 30(b)(6) representative on the topic of
refunding improper payments made to Medicare and identifying and refunding overpayments
received from government payors, if Lincare's refund process worked there should never be a
need to make any refunds in connection with Compliance investigations; any overpayments that
would have caused by improper ticket holding would have been previously repaid or adjusted.
Gangemi 30(b)(6) Dep., at 6:16-19, 9:1-11:5, 34:14-35:9, Ex. 14.

      44.     But in practice, Lincare's refund process functioned abysmally.  For
example, over a seven week period, Lincare Compliance Analyst Barbara Santiago performed
pick up audits in connection with 11 ticket holding investigations conducted by Lincare
Compliance department, investigating various centers across the country.  In these investigations,
the 11 centers improperly held between 13% and 80% of all concentrator pick up tickets, and
improperly billed after the equipment's pickup between 25% to 64% of the time.  When the late
tickets were ultimately processed by Lincare's RBCOs, however, the RBCOs only caught the
improper billing 46% of the time.  The RBCOs failed to process the refunds or adjustments in
54% of the claims where Lincare billed after pick up.  *See* Exs. 113 to 122 and 166 (collected
audits, discussed *infra* at ¶ 61.

45.     Moreover, after reviewing the data Lincare produced in response to the Concentrator Query, Relators' expert, Mary Beth Landrum concluded that when Lincare received payments from the United States after it had improperly billed for services after an inactivation or equipment pick up date, it caught and refunded the overpayments less than half of the time, an error rate of 56.6%. Landrum Revised Supplemental Report, ¶ 17-18 and Table 2B, Ex. 44.

46.     A Regional Reimbursement Manager (who was subsequently produced by Lincare as its Rule 30(b)(6) representative on Lincare's policies and practices on refunds and overpayments) admitted that if Lincare queried its database for the last six years to determine whether it had billed Medicare for oxygen rental equipment it had already picked up, it would probably discover that it owed refunds to Medicare. Gangemi Dep., at 239:13-240:2, Ex. 13.

47.     In connection with this litigation, Relators' expert asked Lincare to query its database to determine whether it owed refunds to Medicare for oxygen equipment rentals that had been billed to the United States after it had picked up its equipment or inactivated billing for a Medicare customer. After running that query Lincare discovered that it did owe refunds to the United States for more than $1.1 million owed on more than 11,000 claims. Landrum Report, ¶ ¶ 38-39 and Table 2, Ex. 42.

## LINCARE HAD THE TOOLS AND INFORMATION TO PROACTIVELY IDENTIFY BILLING AFTER EQUIPMENT PICK UP AND PREVENT AND CORRECT FALSE CLAIMS, BUT FAILED TO DO SO

48.     Lincare knows that holding pick-up tickets causes false claims to be submitted, and that center employees are "holding pick-up tickets to boost their numbers."

Bennett Dep., at 54:9-55:9, Ex. 3; *see* Hite Dep., at 61:19-62:6, 77:14-79:3, Ex. 17; Ex. 159

(LINCARE0215490); Ex. 158 (LINCARE0213157); Ex. 100 (LINCARE0012146-47); Ex. 155

(LINCARE0208985); Ex. 102 (LINCARE0015191) (2012); Ex. 200 (LINCARE0016889)

(2015).

49.     Lincare's holding of pick-ups comprised a "significant number" of its

compliance investigations.  *See* Hite Dep., at 68:3-8, Ex. 17; Ex. 76

(ROBINSDUNLAP0001259, at 1274) (compliance training manual acknowledging that billing

after pickup presents FCA problem).

50.     Even Lincare's own compliance expert conceded that the rate that

Lincare held pick up tickets was problematic.  *See* Little Dep., at 109:9-15, Ex. 22.

51.     Despite this knowledge, Lincare does not systematically attempt to

prevent, identify, and reverse improper billing, notwithstanding the fact that Lincare is aware that

such improper billing occurs on a routine basis.  *See* Hite Dep., at 99:16-25, 100:1-11, 101:11-15

(unaware of any protocols to prevent billing after pick up), Ex. 17; Hager Dep., at 42:6-9

(Lincare compliance does nothing to proactively identify instances of billing after pick up), Ex.

15; Gangemi 30(b)(6) Dep., at 43:6-12, 54:4-10, Ex. 14.  Instead, Lincare elected solely to be

reactive — investigating when compliance violations are reported — to the exclusion of

*proactively* auditing itself using reports to find a greater number of improper claims (which it

was capable of doing).  *See, e.g.*, Makey Dep., at 110:14-25; 220:17-221:2, Ex. 24; Hite Dep., at

120:3-121:21, Ex. 17; Hager Dep., at 42:3-43:15; 60:1-6, Ex. 15; Pedersen Dep., at 126:3-17, Ex.

28; Gangemi 30(b)(6) Dep., at 44:13-16; 79:6-80:12; 90:19-91:7, Ex. 14.

52.     Lincare's compliance investigation files are replete with Lincare drawing the distinction between intentional/malicious overbilling and overbilling as a result of mere mistakes or process errors — the latter problem drawing no attention from Lincare more than a refund if Lincare found it.  *See, e.g.,* Ex. 109 (LINCARE0042446__0009); Ex. 168 (LINCARE0249619) (drawing distinction between intentional/malicious holding of pickup tickets versus "other circumstances"); Ex. 149 (LINCARE0196932) (no "maliciousness" or "pattern," yet almost 6% were held).

53.     Lincare only reactively refunds Medicare in discrete situations that someone brings to its attention.  Lincare does not look for false claims; rather it passively waits to see if someone raises them if someone happens upon them.[3]  *See* Hager Dep., at 42:3-9, Ex. 15; Gangemi 30(b)(6) Dep., at 43:6-12, 54:4-10, Ex. 14.  Overpayments are identified — if at all — on an *ad hoc* basis resulting from an external event, such as a customer phone call or complaint.  *See* Hager Dep., 42:3-12, Ex. 15.

54.     In other words, Lincare does *not* audit itself to look randomly for instances of false claims.  *See* Little Dep., at 16:12-21; 23:1-6; 59:17-60:10; 61:7-9; 68:9-21, Ex. 22; Hite Dep., at 58:19-59:13, Ex. 17; Makey Dep., at 220:17-221:2, Ex. 24; Gangemi Dep., at 204:16-206:17, Ex. 13.

---

[3]     Lincare has a formal policy encouraging its employees to report mistakes to Compliance, and Lincare recognizes that it *would* be missing overbillings requiring refunds without such information.  Pedersen Dep., at 92:22-93:2, Ex. 28.  However, in practice, RBCO personnel instructed employees, such as Relator Dunlap, to ignore mistakes — not to report them to the compliance department — because, according to Ms. Pedersen, "mistakes are not compliance issues."  White Dep., at 129:2-21; 133:20-134:15, Ex. 39.  Ms. Pedersen instructed Ms. Dunlap only to report on "intentional" compliance concerns.  *Id.* at 130:11-20.

55.     But Lincare has the ability to run reports of its internal database that provide information about potential overbilling to government payors.  *See* Makey Dep., at 146:10-20, Ex. 24; Gangemi Dep., at 120:19-22, Ex. 13; White Dep., at 43:13-23, 44:1-12, Ex. 39; Smith Dep., at 22:20-23, 23:1-17, Ex. 34.  If these queries were run and checked, Lincare billing officials admit Lincare would have likely found it owed refunds to Medicare.  Gangemi Dep., at 129:1-15, 239:13-240:2, Ex. 13.

56.     Lincare does not run these reports on a regular basis and does not make any systematic attempt to ensure that overpayments are identified and repaid.  *See* Little Dep., at 74:7-24, Ex. 22; Pedersen Dep., at 126:14-17, Ex. 28; Smith Dep., at 25:15-23, 26:1-3, Ex. 34.

57.     The principal tool used by compliance investigators to determine whether a center is holding pick up tickets is a pick up report — a report Lincare's IT department routinely generates upon request of compliance investigators.  These reports identify all concentrator pickups and inactivations within a given period and the length of time between when equipment was actually picked up and when that information was forwarded to the RBCO.  *See* Bennett Dep., at 91:5-10, 99:1-6, 100:12-20, Ex.3; Dillon-Sarra Dep., at 29:7-31:6,  52:12-25, 57:11-13, 64:11-14, Ex. 10; Hager Dep., at 17:18-19:2, Ex. 15; Makey Dep., at 144-6-16, 145:7-23, Ex. 24; Hite Dep., at 74:8-75:15, 77:14-79:3, Ex. 17.

58.     Pick up reports specified the number of days between the date Lincare picked up a customer's equipment and the date Lincare entered that information into the system.  The longer the gap between the actual pickup and the entry of the information into the system, the more likely that Lincare improperly billed for the equipment rentals.  *See e.g.*, Ex. 196

(LINCARE0005714) (analyzing several dozen Virginia Beach customers' accounts where equipment pickups were entered into the system between 10 and 92 days after the equipment was actually picked up). Pick up reports could also show how much time how much time elapsed between when it should have inactivated a patient's account and when it actually did. *Id.* Again the longer the gap between the date the billing should have stopped and the date the information was entered into the system, the greater the likelihood that bills were improperly sent out and payments received. *See* Bennett Dep., at 118:11-25, Ex. 3; Dillon-Sarra Dep., at 68:25-69:24 (Referring to– LINCARE0002109-2113 )(Ex. 191)), Ex. 10; Hite Dep., at 105:15-106:13 (Referring to LINCARE0196913-14 (Ex. 149)), 107:12-20, Ex. 17; Pedersen Dep., at 126:2-8 (also referring to report as a "holding pick-up report"), Ex. 28.

59.    Based on pick up reports, Lincare compliance analysts and investigators were able to determine the number (and percentage) of claims that centers held over the next month (which would improve a center manager's oxygen "number"), the number (and percentage) of tickets held seven or more days after pick-up, the number (and percentage) of claims that Lincare billed after it had picked up its equipment, and for those accounts billed after pickup, the number (and percentage) of such claims that Lincare's billing department caught through its usual inactivation and refund processes. *See* Exs. 113 to 122 and 166 (P/U audits described in par. after next)

60.    Although Lincare had the ability to proactively generate pickup reports, it failed to do so. It only ran pickup reports in reaction to reports of improper behavior. Pedersen Dep., at 126:11-128:18, Ex. 28.

61.     Lincare produced ten pick up audits performed by Compliance Analyst Barbara Santiago between September 17, 2008 and November 7, 2008 in connection with ten pick up holding investigations Lincare performed for ten centers across the United States.  *See* Exs. 113 to 122 and 166 (audits).  For each of these audits, the table below sets forth the percentage of picked up equipment tickets that were held into the following month, the percentage of those billable tickets that were held over 7 days; the percentage of held tickets for which Lincare billed ("improper claims"); the percentage of improper claims Lincare's billing system either adjusted or refunded, and the percentage of improper claims that Lincare's system failed to catch.

| | % of tickets held into next month | % of billable tickets held > 7 days | % of held tickets that Lincare billed | % of improper claims refunded or adjusted | % of improper claims not refunded |
|---|---|---|---|---|---|
| Torrance, CA | 32% | 78% | 59% | 46% | 54% |
| Marlborough MA | 42% | 90% | 56% | 73% | 27% |
| Hannibal, MO | 34% | 88% | 61% | 48% | 53% |
| Norwich, CT | 75% | 100% | 35% | 47% | 53% |
| Bridgeport, CT | 36% | 74% | 64% | 70% | 30% |
| Newman, GA | 80% | 95% | | | |
| Rome, GA | 37% | 95% | 53% | 34% | 66% |
| Asheville, NC | 13% | 80% | 25% | 17% | 83% |
| Bristol, CT | 27% | 80% | 35% | 60% | 40% |
| Ringgold GA | 39% | 67% | 55% | 18% | 82% |
| New London, CT | 39% | 87% | 63% | 66% | 34% |

Excluding Newman, GA[4] (for which claim numbers are not reported), for these centers, Lincare's billing office failed to process refunds or adjustments for 54% of the claims that were billed after pick up.  *See* Ex. 113 (LINCARE0054801); Ex. 114 (LINCARE0054802);

---

[4]     For Newman, Georgia Ms. Santiago did not report the number of claims billed after the equipment was picked up, but only the number of customer accounts for which Lincare billed after pick up.  These percentages are based on the percentage of customer accounts for which there was post pickup billing, not percentage of claims.

Ex. 115 (LINCARE0054803-05); Ex. 116 (LINCARE0054806); Ex. 117 (LINCARE005408);

Ex. 118 (LINCARE0054810); Ex. 119 (LINCARE0054811); Ex. 120 (LINCARE0054812); Ex.

121 (LINCARE0054813); Ex. 122 (LINCARE0054817); and Ex. 166 (LINCARE0228751).

62.     Lincare's A/R Write-Off Report shows all recognized instances of

Medicare or Medicaid overbilling for various reasons, including the fact that the customer was in

a nursing home or hospital at the time of the bill, or there was a bill after the customer was

inactivated, or there was a bill after the date when the customer's equipment was capped

(meaning that Lincare should have not have received payment for it).  *See* Gangemi 30(b)(6)

Dep., at 75:6-23, 76-79, 85:15-23, 86:1-23, Ex. 14.  This report can be used by Lincare to isolate

instances of overbilling third-party payors, including government payors, such that Lincare could

refund any overpayments made.  *See id.*, at 79:6-23, 80:1-12, 86:6-22 (explaining steps necessary

to identify instances of overpayment using A/R Write-Off Report).

63.     Lincare can also run a report called the Active Customers Without

Equipment report to identify customers who are active in the billing system (and, presumably,

for whom Lincare is billing Medicare or another payor for these customers' equipment), but the

customers do not, in fact, have any equipment.  Lincare can use this report to isolate instances of

billing third-party payors, including government payors, when the customer has no equipment.

*See* Gangemi 30(b)(6) Dep., at 67:23, 68:1-19, Ex. 14.

64.     Another report that Lincare can run is called the Inactive With Equipment

report (also known as the Inactive Customer Equipment Listing), showing the dates of customer

inactivation and the dates of equipment pick-up.  *See* Gangemi Dep., at 161:1-22, Ex. 13.

65.     By comparing the inactive date to the pick-up date, Lincare can identify instances where it has continued to bill Medicare and other payors for a customer's equipment when the equipment has already been picked-up.  *See id.*, at 122:3-16 (discussing search parameters necessary to produce report showing billing after pick-up or inactivation date).

66.     Although Lincare's system can generate these reports upon request, it does not use these reports to identify instances of overpayments received from the government and does not determine how much money it owes the United States, for held delivery tickets or any of the other circumstances that result in Lincare routinely billing the United States after billing was required to stop.  *See* Pedersen Dep., at 126:14-17, Ex. 28.

67.     Lincare agreed that an effective compliance department "should be finding as many of the improper claims as they can find, and ideally reducing the number of improper claims."  Little Dep., at 64:19-65:1, Ex. 22.

68.     The Office of the Inspector General of Health and Human Services has issued guidelines for Durable Medical Equipment (DME) providers.  The guidelines are the industry standard for compliance in DME vendors such as Lincare.  *See* Appendices of Little Rpt., App'x B, Ex. 48.  The guidelines identify seven fundamental elements for an effective compliance program.  One of these, which the Guidelines characterize as "critical" is the need for internal monitoring and auditing.  *Id.*, at 36368, 36385.  The Guidelines describe the following techniques to insure that this critical function of monitoring and auditing is performed:

> Although many monitoring techniques are available, one effective tool to promote and ensure compliance is the performance of regular, periodic compliance audits by internal or external auditors

who have expertise in Federal and State health care statutes, rules, regulations, and Federal, State and private payor health care program requirements.

In addition, the DMEPOS supplier should focus on any areas of specific concern identified within that DMEPOS supplier and those that may have been identified by any entity, wither Federal, State, Private or internal.

Monitoring techniques may include sampling protocols that permit the compliance officer to identify and review variations from an established baseline. <u>Significant variations from the baseline should trigger a reasonable inquiry to determine the cause of the deviation.</u> If the inquiry determines that the deviation occurred for legitimate, explainable reasons, the compliance officer and DMEPOS supplier management may want to limit any corrective action or take no action. <u>If it is determined that the deviation was caused by improper procedures, misunderstanding of rules, including fraud and systemic problems, the DMEPOS supplier should take prompt steps to correct the problem.</u>

However, <u>when monitoring discloses that deviations were not detected in a timely manner due to program deficiencies, appropriate modifications must be implemented.</u>

We recommend that these audit reports be prepared and submitted to the compliance officer and senior management to ensure they are aware of the results. We suggest the reports specifically identify areas where corrective actions are needed. With these reports, DMEPOS supplier management can take whatever steps are necessary to correct past problems and prevent them from recurring. In certain cases, subsequent reviews or studies would be advisable to ensure that the recommended corrective actions have been implemented successfully.

<u>The OIG recommends that all DMEPOS suppliers, regardless of size, conduct audits to ensure compliance with the applicable statutes, regulations and policies.</u> The OIG recognizes that the small DMEPOS supplier may not have the resources to audit its operations to the extent suggested previously in this section. At a minimum, the OIG recommends that the small DMEPOS supplier conduct an internal audit. <u>The DMEPOS supplier may choose to review a random sample of claims based on the risk areas it identified. We recommend that the DMEPOS supplier conduct an initial baseline audit and periodically conduct follow-up audits.</u>

- 25 -

<u>The extent of a DMEPOS supplier's audit should depend on the
DMEPOS supplier's identified risk areas and resources.</u>

Little Rpt., App'x B, at 36385-86 (emphasis added, internal footnotes omitted), Ex. 48.

69.     Lincare could have instituted a program of internal reviews and sought
external audits of its billing data in order to detect false claims proactively, and not simply rely
on after-the-fact, sporadic complaints to do so.  *See* Ex. 40, Jacqueline Bloink Expert Witness
Report, April 28, 2016 at 19 (BLOINK 001).  With that information, Lincare could refund the
overpayment and make changes in its policies to head off and avoid future false claims.  *Id.*  It
did not do so.

70.     If Lincare had conducted monitoring and auditing in conformance with the
OIG Guidelines and compliance industry standards, it would have discovered additional
instances of improper billing requiring refunds. *See* Little Dep., at 74:7-24, Ex. 22; Gangemi
Dep., at 129:1-7, Ex. 13.

71.     Lincare's principal method of deterring ticket holding was education and
reeducation.  *See* Hite Dep., at 70:11-25, Ex. 17.  Yet, Lincare recognized that the persons who
held tickets had been extensively trained and still engaged in unlawful behavior.  Pedersen Dep.,
at 119:10-18, 120:7-18, Ex. 28.  Lincare's training programs did not stop, or even deter improper
ticket processing.  Lincare's compliance department's workload remained *constant* over the
years.  *See* Dillon-Sarra Dep., at 37:17-23, Ex. 10.

72.     Lincare never publicized or disseminated the results of internal compliance investigation or the discipline handed down, a practice that might have deterred employees from holding pickup tickets.  Filo-Loos Dep., at 190:22-191:7, Ex. 12.

73.     And Lincare appeared to believe that a "pattern of mistakes" was *not* a compliance concern — even if they occur among several service centers.  *See* White Dep., at 131:9-132:10, Ex. 39.  At Lincare, "that's how it works."  *Id.* at 134:2-15.

74.     False Claims that were caused by Lincare's deliberate decision to depart from OIG Compliance Guidelines were presented as a result of Lincare's reckless disregard for the truth or falsity of the claims they presented to the United States.  Ex. 40 at 4, 21 (Bloink Report); Ex. 41, Relators' Expert Witness Rebuttal Report, June 10, 2016 at 3, 16, 21, 25, 27, 29, 36, 38, and 39 (BLOINK 002).

75.     This is significant in light of Lincare's prior illegal acts and its resolution of same.  On May 15, 2006, as a condition of a settlement between the United States and Lincare, Lincare entered into a five year Corporate Integrity Agreement ("CIA").  *See* Ex. 62 (CIA).  At the time it executed the CIA, Lincare paid a substantial amount to resolve an investigation by the HHS Office of the Inspector General into kickbacks Lincare made to its referring physicians and settled investigations brought under the False Claims Act in Massachusetts, Tennessee and Idaho.  The settlement with the OIG was, at the time, the largest ever civil monetary penalty case ever resolved by the OIG.  *See* Exs. 55 and 56 (May 15, 2006 Press Releases by Lincare and the OIG).  The Massachusetts FCA action concerned overbilling Medicare for oxygen services at three centers in Massachusetts, Marlborough, Cherry Valley and

Dudley. Ex. 95 (LINCARE0002087). Mary Sweet was the area manager for those centers at the

time of the settlement and at the time of the alleged misconduct. *See* Sweet Dep., at 24:19-25:9,

Ex. 35.

76.     Lincare's Compliance Officer at the time of the 2006 Settlement, and at

the time of most of the misconduct alleged in the OIG investigation and the three FCA settled

FCA suits, was Jenna Pedersen. She is still Lincare's Compliance Officer and has not

significantly changed Lincare's compliance policies. *See* Bloink Dep., at 166:23-168:2; 204:6-

205:13; 207:2; 208:14-209:8; 302:8-20, Ex. 4; Ex. 40, Bloink Rpt. at 6-8, subsection 1; 19,

subsection 7).

77.     The CIA required Lincare to implement several policies evidencing its

commitment to prepare and submit accurate claims consistent with the requirements of all

Federal Health Care Program Requirements. Among those policies, Lincare committed to

recognize and enforce that, "[a] person who puts forth insufficient effort to ensure accurate

billing or who *allows patterns of mistakes to continue* because of lax supervision or attention to

the rules, may be held accountable for submitting 'false claims'." Lincare Holdings Inc. and

Lincare Inc. Corporate Integrity Agreement, October 10 2006 Implementation Report, Ex. 211

(at LINCARE0191817 and LINCARE0191820) (emphasis added).

78.     Notwithstanding Lincare's alleged implementation of the policy recited

above, its Compliance Officer does not recognize that "a pattern of mistakes" can lead to an FCA

violation. With regard to preventing and redressing potential violations of the False Claims Act

by Lincare, she recognizes intentional acts can create such violations, but does not have the same

concern for acts taken with "reckless disregard."  *See* Pedersen Dep., at 72:25-73:17, Ex. 28.

### LINCARE'S FAILURE TO IDENTIFY AND CORRECT BILLING AFTER PICK UP CAUSED FALSE CLAIMS

79.     In response to Relators' requests, Lincare produced customer records that

would identify customers on whose behalf Lincare billed the United States *after* the date that

billing for the concentrator should have ceased, how much money Lincare received in connection

with those claims, and what, if anything, was refunded.[5]

80.     On October 8, 2015, Lincare produced data records for 254,654 of its

customers.  The data reflected that, on at least 24,522 occasions, Lincare received payments for

these customers' accounts after the date their equipment was picked up.  On another 10,595

occasions, Lincare inactivated accounts knowing that it had already billed Medicare and/or

received reimbursement for services allegedly performed after the date it was no longer allowed

to bill.  It also improperly billed Medicare on at least 286 occasions after it had inactivated its

customers' account, which should have terminated all billing.  Lincare only refunded monies it

received on these accounts, notwithstanding the fact that it was not entitled to any of this money

less than 50% of the time.  Its error rate in processing these refunds was 56.1%.  According to

Relators' expert witness, Mary Beth Landrum, Ph.D, the damages to the United States on these

claims are $2,143,697.  Landrum Rpt., ¶ 31, Ex. 42; Landrum Revised Supp. Rpt., ¶¶ 16-18,

Table 2B, Ex. 44.

---

[5]     Relators initially requested that Lincare produce all relevant customer records of its concentrator and portable oxygen customers during the relevant period, 2004 to the present.  Lincare refused to produce the documents on many grounds including that production of the requested records would be unduly burdensome.  *See* Ex. 65 (Lincare Response to Relators' Request for Production of Documents).

81.     After those records were generated, Lincare reviewed them.  Although all of the claims had supposedly already been through Lincare's refund process, in November 2015, Lincare paid Medicare $1,156,791 on behalf of 11,213 payments Lincare had received payment for equipment rentals after the date Lincare had retrieved its equipment or after the date it acknowledged it was not entitled to bill.  All of these claims had been identified by Relators' expert, Dr. Landrum, as false claims (because they were bills for rentals after the Lincare had picked up its equipment) or overpayments (because Lincare knew (or should have known) that it had billed the United States for unreimbursible services when it inactivated the account.).  *See* Landrum Rpt., at ¶¶ 33, 38-40, Ex. 42; Landrum Revised Supp. Rpt., ¶ 16, Ex. 44; Gangemi 30(b)(6) Dep., at 55:17-57:10; 61:7-16, Ex. 14.

82.     Lincare's corporate representative on the topic of Lincare's refunding process was not surprised that Lincare should have refunded payments for over 11,000 claims because "we do find out after the fact that the customer's no longer using the equipment.  That's not a surprise in our business."  Gangemi 30(b)(6) Dep., at 64:18-65:2, Ex. 14.

83.     Lincare acknowledged that it only paid these overpayments because the claims were flagged by the Relators' request and this litigation.  Lincare's billing system, however, had all the necessary information to locate and quantify the number and amount of refunds owed.  *See* Gangemi 30(b)(6) Dep., at 56:17-58:14, Ex. 14.

84.     Notwithstanding the fact that it would not be "surprising" to find overpayments Lincare did not refund to the United States if Lincare ran the Concentrator query on its archived data records, the Rule 30(b)(6) corporate designee on Lincare's refund policies

and practices testified that Lincare has no plans to do any further reviews to flag and quantify

other overpayments that Lincare received in periods covered by the archived data records.  *See*

Gangemi 30(b)(6) Dep., at 63:16-21; 64:18-65:2, Ex. 14.  The same witness had previously

testified that if Lincare audited the last six years of its records, it would "probably" find that

Lincare had billed the United States after it had picked up rental equipment or after it had

inactivated an account.  Gangemi Dep., at 129:1-7, Ex. 13.

85.     Relators have also identified instances of Lincare's improper billing.  For

example, Lincare customer JB of Lewes, DE (account no. 024-250-003 253) had insurance

through Medicare and Tricare.  Lincare was aware by October 9, 2008 that the customer had died

on September 10, 2008.  Lincare billed Medicare on September 13, 2008 for $159.42 and

$25.43, but Lincare refunded Medicare these amounts on October 17, 2008.  Lincare billed

Tricare on September 12, 2008 for $39.86 and $6.36, and Tricare paid Lincare those amounts.

As of July 2009, Lincare issued no refunds to Tricare.  *See* Ex. 175 (ROBINSDUNLAP0001618-

1626).[6]

86.     Lincare billed Medicare for customer ME of Cristfield, MD (account no.

039-580-000 339) on December 29, 2009 for $140.63.  The customer's equipment, however, was

picked-up on December 7, 2009, and the account was inactivated on that date, as well.  Medicare

paid Lincare the entire amount of each bill and, as of February 2010, Lincare had issued no

refunds to Medicare.  Relator Dunlap brought this customer to the attention of Melissa Hite, an

---

[6]      The fact that Lincare may have issued a refund relevant to one or more of these exemplars — after the
complaint was served in this case and, incidentally, more than 60 days after identifying the overpayment —
is irrelevant to whether an actionable false claim exists.

employee in Lincare's Compliance Department, on February 4, 2010.  *See* Ex. 171 (ROBINSDUNLAP0000022-23).

87.    Lincare customer HL of Pikesville, MD (account no. 372-682-439 A) called Lincare in January 2004 to request that her equipment be picked-up.  She called again on March 9, 2004 to have the equipment picked-up.  Then, in 2010, the customer's husband called Lincare and said that he had called many times before about wanting the equipment picked-up because his wife, the customer, did not use it any longer.  But Lincare billed Medicare on:

- August 24, 2008 for $12.88;

- February 24, 2009 for $13.53; and

- August 23, 2009 for $13.53.

*See* Ex. 172 (ROBINSDUNLAP0000395-406).

88.    Lincare inactivated customer HSS of Atlantic City, NJ (account no. 018-530-002 954) on July 23, 2008 and picked-up the customer's equipment on the same date.  But it billed Medicare on:

- August 14, 2008 for $159.42, and $25.43;

- September 12, 2008 for $184.85;

- October 12, 2008 for $184.85, and

- November 12, 2008 for $184.85.

Medicare paid Lincare the entire amount of each bill and, as of May 2009, Lincare issued no refunds to Medicare.  *See* Ex. 176 (ROBINSDUNLAP0001627-1665).

89.     Lincare inactivated customer LM, of Wall, NJ (account no. 004-430-002 691) and picked-up her equipment on September 21, 2007 because she went into the hospital, but Lincare billed Medicare on September 29, 2007 for $158.72.  Medicare paid Lincare for this bill and, as of May 2009, Lincare issued no refunds to Medicare.  *See* Ex. 177 (ROBINSDUNLAP 0001681-1689).

90.     Lincare inactivated the account of customer MG of Moorefield, WV (account no. 033-700-001 093) on August 18, 2008 because his condition had improved. Lincare, however, continued to bill Tricare on:

- August 20, 2008 for $7.39;

- September 20, 2008 for $7.39;

- October 20, 2008 for $7.39; and

- November 20, 2008 for $7.39.

Tricare paid Lincare the entire amount of each of the bills and, as of May 2009, Lincare issued no refunds to Tricare.  *See* Ex. 183 (ROBINSDUNLAP0003446-3452).

91.     Lincare picked up the equipment of customer RB, of West Milford, NJ (account no. 000-370-001 595) on August 23, 2008, but did not inactivate the account until October 28, 2008. Lincare continued to bill Medicare on August 30, 2008, October 1, 2008,

- 33 -

October 31, 2008, November 30, 2008, and December 31, 2008. Each bill was in the amount of

$159.42. Medicare paid Lincare the entire amount of each of the bills and, as of May 2009,

Lincare issued no refunds to Medicare.  *See* Ex. 231 (ROBINSDUNLAP0002006-2026).

92.     Lincare picked-up the equipment for customer EC of Nokomis, FL

(account no. 004-280-001 123) on February 6, 2009.  Lincare, however, billed Medicare on

February 20, 2009, March 20, 2009, April 19, 2009, May 20, 2009, June 20, 2009, and July 19,

2009.  Each bill was in the amount of $163.65.  Medicare paid Lincare the entire amount of each

of the bills and, as of August, 2009, Lincare issued no refunds to Medicare.  *See* Ex. 178

(ROBINSDUNLAP0001700-1708).

93.     In another example, Lincare charged Medicare from February 2008 to

February 2009 even though customer ME, of Bowie, MD (account no. 024-370-001 594)

requested a pick-up of her equipment on December 21, 2007.  Specifically, the customer

requested a pick-up on December 21, 2007, but was told by Lincare that she needed a sign-off

from her physician before Lincare could pick-up the equipment.  The customer called Lincare

again on April 1, 2008, referenced the December 2007 call, and informed Lincare that her

physician had faxed "numerous" orders to Lincare to disconnect treatment.  Lincare, however,

did not pick-up the equipment until November 3, 2008, and the customer signed a Refusal of

Treatment form on that date, as well.  Then, on June 5, 2009, the customer spoke with Lincare

and again said that she had been trying to get the equipment picked-up since 2007, that her

physician sent a disconnect order in early 2008, and that the equipment was not picked-up until

the end of 2008.  Lincare even had the physician's disconnect order, dated July 31, 2008, in the

customer's file.  Despite having this information, Lincare billed Medicare on:

- February 5, 2008 for $184.85;

- February 13, 2008 for $184.85;

- March 13, 2008 for $184.85;

- April 13, 2008 for $184.85;

- May 13, 2008 for $184.85;

- June 13, 2008 for $184.85; and

- February 6, 2009 for $159.42, $25.43, and $739.40.

See Ex. 179 (ROBINSDUNLAP0000001709-1733).

**LINCARE'S CHARGING FOR UNNECESSARY PORTABLE OXYGEN TANKS**

94.     Many Lincare oxygen patients also had prescriptions for portable oxygen. *See* White Dep., 19:23, 20:1-14, Ex. 39.  Patients often use portable oxygen tanks when outside of their homes.  *See* DelBiondo Dep., at 20:3-7; 109:7-110:12, Ex. 8.

95.     Different portable oxygen patients ordered different amounts of portable oxygen tanks every month, with some ordering fewer and some ordering more.  *See* DelBiondo Dep., at 63:21-64:3; 66:4-16; 118:21-119:20, Ex. 8.  Many patients who regularly used their portable oxygen ordered multiple tanks a month.  *See* Hite Dep., at 225:11-23 (explaining that most portable oxygen customers used multiple tanks), Ex. 17. As a portable oxygen patient's condition deteriorates, it is customary for that customer to require less and less portable oxygen. *See* DelBiondo Dep., at 20:3-4; 95:21-96:9; 109:4-11:12, Ex. 8.

- 35 -

96.     Prior to January 2009, Lincare received monthly payments from Medicare for its customers who had been prescribed portable oxygen, regardless of whether or not it supplied the patient with new portable tanks.  *See* DelBiondo Dep., at 92:12-24, Ex. 8.  Thus, Lincare service representatives only provided customers with new portable oxygen tanks upon request.  *Id.* at 94:19-25, 95:1-1.

97.     But as a result of changes in Medicare reimbursement that became effective January 1, 2009, Lincare could receive payment for the rental of portable oxygen equipment for 36 months.  After 36 months, a patient's portable oxygen benefit capped. However, during the cap period, the reimbursement scheme permitted Lincare to receive reimbursement if it actually delivered oxygen content—a portable oxygen tank—to the patient for the month in question.  *See* White Dep., at 21:2-6, Ex. 39; DelBiondo Dep., at  93;6-23, Ex. 8 ; Traylor Dep., at 71:3-10; 79; 3-11, Ex. 37; Gangemi Dep., at 33:16 – 36:6, Ex. 13; and Ex. 207 (LINCARE 0141891-94).

98.     Medicare will only reimburse providers like Lincare for necessary expenses.  *See* 42 U.S.C. 1395y(a)(1)(A).  And Chapter 5 of the Medicare Program Integrity Manual states that suppliers like Lincare *must* contact the patient prior to delivery of a refill to ensure that the refilled item is reasonable and necessary.  Ex. 57, at § 5.2.8 (Medicare Program Integrity Manual).

99.     Lincare has acknowledged that it was *not* permitted to deliver portable oxygen cylinders to patients who did not need them.  *See* DelBiondo Dep., at 101:16-103:3; 109:4-13, Ex. 8; Mosby Dep., at 89:4-15; 98:1-99:4; 99:21-25; 102:13-21; 104:17-105:14, Ex.

27; *see also* Ex. 140 (LINCARE0156900); Gangemi Dep., at 78:11-80:14, Ex. 13; Ex. 205

(LINCARE0057630-31).

100.    But Lincare recognized that the 2009 changes to Medicare oxygen

reimbursement represented a serious threat to its revenues and profits.  *See* Mosby Dep., at

37:25, 38:1-11, 39:6-25, 40:1-19 (discussing Lincare report prepared by senior management and

projecting approximately $70 million decrease in revenue due to 2009 Medicare changes), Ex.

27; Traylor Dep., at 58:14-17, Ex. 37.

101.    And to offset some of the revenue lost by the oxygen reimbursement

changes, Lincare focused on maximizing portable oxygen revenue.  By delivering monthly tanks

to customers who did not frequently request tanks, additional revenue could be generated.

Lincare made it a corporate priority to deliver tanks regularly to all capped portable oxygen

customers regardless of whether those customers needed them or requested them.  *See* McCarthy

Dep., at 132:2-25, 133, 134 (discussing e-mail instructing service centers to provide portable

oxygen "fills" to all eligible customers without regard to need), Ex. 25; DelBiondo Dep., at 15:3-

25, 16:1-13, 96:10-17, Ex. 8; Bower Dep., at 99:8-24, 100:1-9, 139:8-16, Ex. 5.

102.    In other words, Lincare anticipated these 2009 Medicare changes and

developed a plan to keep its fee revenue from dropping as a result.  *See* Ex. 107

(LINCARE0041599-614), at 1-3.  Lincare focused on what it called "Group 2" Medicare

patients (those to be "capped" under the new Medicare policy) as those who would have the

"greatest impact" on Lincare's operations.  *Id.* at 5-8.  Lincare is entitled to reimbursement for

oxygen "fills" (*i.e.*, oxygen tanks) for these Group 2, or "capped," Medicare patients.  *Id.* at 6.

So, Lincare decided that these patients "must receive fills at least 1/month." *Id.* Lincare

intended to identify these customers *via* a *Capping Medicare O2 Contents Customers* report that

would "provide the names of the patients and the date the fill is due by to receive reimbursement

for a fill that month. It is VERY important that centers are watching these dates." *Id.* (emphasis

in original).

103.     Lincare knew when it embarked on this plan that many portable patients

did not need additional oxygen. *See* Mosby Dep., at 116:4-23, Ex. 27. Lincare was also

unaware of how many portable patients only needed a limited number of tanks. Mosby Dep., at

42:3-19; 45:5-12; 116:4-10; 118:9-11, Ex. 27; Traylor Dep., at 175:11-21; 209:19-210:1; 214:18-

20, Ex. 37.

104.     To implement its plan, Lincare devised a report to be distributed weekly to

area managers to show fills that were needed, and the only way to get patients off the report was

to enter a delivery date. *See* Ex. 165 (LINCARE0225986). The resulting "Center Fill

Management Report" identified capped patients to receive portable oxygen deliveries to satisfy

Lincare's goals. *See*, Ex. 132 (LINCARE0127165-66). This report identified Medicare

beneficiaries whose oxygen payments had been capped under the 2009 Medicare reimbursement

changes, but for whom Lincare could receive portable oxygen payments if oxygen was delivered.

*See* Traylor Dep., at 86:7-16, Ex. 37; McCarthy Dep., at 132:2-5, Ex. 25. The reports informed

regional managers, area managers, and center managers when to deliver a portable oxygen tank

to each patient so Lincare could bill Medicare monthly for portable oxygen. *Id.* Starting in

January 2009, when capped periods started to mature, for each center across the country Lincare

generated and distributed reports that identified those customers who had prescriptions for

portable oxygen but who had not recently received new tank deliveries.  *See* Traylor Dep., at 72:8-15, Ex. 37; McCarthy Dep., at 132:2-10, Ex. 25.

105.    The only reason for Lincare's corporate headquarters to distribute these reports to each and every center was to have the centers solicit the listed customers for deliveries of portable oxygen which those customers did not otherwise need or require.  *See* McCarthy Dep., at 132:6-10, Ex. 25; DelBiondo Dep., at 115:25, 116:1-12, Ex. 8; Klak Dep., at 22:12-22, Ex. 18; Ex. 125 (LINCARE0120208).  After the reports were received at the local centers, center managers instructed service representatives to get the customers on the list to accept new oxygen tanks.  *See* Bower Dep., at 99:8-24, 100:1-9, Ex. 5.

106.    For those customers who did not want new tanks, there was no way to remove them from the weekly lists.  *See* Ex. 165 (LINCARE0225986) (e-mail from Steve Bower stating the only way to get patients off list is to enter date of delivery of equipment).

107.    Lincare encouraged its employees to give all capped patients fills every month.  *See* Ex. 163 (LINCARE0225975); Ex. 164 (LINCARE0225985).  Many Lincare managers instructed their subordinates to deliver oxygen tanks to all capped patients on the list — "NO EXCUSES."  *See* Ex. 131 (LINCARE0127148); Ex. 153 (LINCARE0201235); Ex. 96 (LINCARE0002089, at 2090 – item 4).  Reimbursement specialists from Lincare's corporate offices conducted conference calls and held regional conferences across the country to instruct area manages and center managers how to use these reports.  *See* Traylor Dep., at 58:23-24, 59:1-11, 103:21-24, 104:1-24, 105:1-4, Ex. 37; Ex. 146 (LINCARE0193040); Ex. 146 (LINCARE0193042).

- 39 -

108.    Conferences were held in all Lincare regions, including one hosted by a Lincare Regional Vice President for area managers and center managers in Lynchburg, Virginia. *See* DelBiondo Dep., at 12:16-25, 13:1-5, 15:2-25, 16:1-13, Ex. 8.  In these conferences, area managers and center managers were told to use the new reports to identify customers who could be pressured into ordering portable oxygen they did not need.  *See id.*

109.    In the meeting at Lynchburg, the Regional Vice President told employees that it was critical that oxygen be delivered to capped patients.  *See* DelBiondo Dep., at 15:1-9, Ex. 8.  He went on to explain that if patients were not willing to accept more oxygen, Lincare employees must "apply some pressure" and tell the customer that they would report to their doctor that the patient was not following their prescription.  *Id.* at 15:10-17.  These instructions were given in the presence of a Lincare Vice President, who did not express disapproval.  *See id.* at 11:15-25; 12:1-24.

110.    Lincare told its managers to send their service representatives to the listed homes to get the customers to accept the new portable oxygen tanks they never ordered.  *See* DelBiondo Dep., at 168:15-170:1-16, Ex. 8.

111.    As Lincare knew, getting its service representatives to accept tanks on a regular basis could run afoul of Medicare rules governing the provision of unnecessary supplies. According to the guidelines promulgated by the Office of the Inspector General of Health and Human Services for Durable Medical Equipment providers, Lincare should have provided a comprehensive set of written policies and procedures to its employees regarding the proper

manner in which to provide patients with portable tanks (*i.e.*, calling ahead of time).  *See* Little

Rpt., App'x B, at p. 3672, Sect. 2, Ex. 48.

112.    Lincare never provided such instructions.  *See* Bower Dep., at 111:20-

115:3, Ex. 5; Filo-Loos Dep., at 240:11-15; 241:20-242:2, Ex. 13; DelBiondo Dep., at 108-13-

109:3; 110; 13-25, Ex. 8; Traylor Dep., at 167:14-169:5, Ex. 37; Mosby Dep., at 117:16-118:8,

Ex. 27; McCarthy Dep., at 101:4-18, Ex. 25.

113.    To the contrary, and for some customers, Lincare's management

instructed the service representatives to first threaten the customers that if they refused to accept

new portable tanks, they might lose their portable oxygen benefit entirely.  *See* Rabassa Dep., at

248: 2-10, Ex. 31.

114.    When threats that a customer might lose their portable oxygen were

unsuccessful, the service representatives were instructed to replace the backup tank for the

customer's stationary system.  *See* LaRe Dep., at 72:22-25, 73:1-14, Ex. 20.  Specifically, the

representatives were told to insist on checking whether the customer's back-up tank had

"expired," even though Lincare knew that these back up tanks were likely not expired.  *See*

DelBiondo Dep., at 170:21-25 ("Expiration is the least common reason[.]"), Ex. 8.  The service

representatives could then "swap out" a perfectly good back up tank for a new one.  *See* Traylor

Dep., at 216:13-17, 218:4-9, Ex. 37.

115.    Despite the fact that no portable oxygen was delivered, representatives

were still instructed to then obtain a signed ticket certifying the receipt of portable oxygen.  *See*

LaRe Dep., at 80:5-25, 81:1-24, Ex. 20.  The ticket was then used to bill Medicare for a portable

oxygen fill that was not performed, and for which reimbursement was, thus, unavailable.  *See id.*

116.    In other cases, Lincare employees were instructed to swap out a full tank

for another full tank.  *See* DelBiondo Dep., at 176:13-22, Ex. 8.  This instruction came from a

Lincare regional vice president.  *See id.* ("as Traylor was explaining it, a full tank for a full tank

was fine as long as you had the appearance that you were getting in the house and doing

something and having them sign the delivery ticket with the portable on it.").

117.    Backup tanks for oxygen concentrators are supposed to be provided for

free, and Medicare does not reimburse providers for changing them, especially not when such a

charge is misrepresented as the provision of necessary portable oxygen.  *See* DelBiondo Dep., at

171:15-20, Ex. 8; Dillon-Sarra Dep., at 240:3-14, Ex. 10.  Lincare employees admitted that

swapping out full backup tanks and billing for that service was wrong, and that Lincare could not

seek Medicare reimbursement for the practice.  Dillon-Sarra Dep., at 239:17-240:11, Ex. 10;

Gangemi Dep., at 80:3-14, Ex. 13; Hite Dep., at 210:15-22, Ex. 17; Traylor Dep., at 135:10-15,

Ex. 37; Sweet Dep., at 169:1-20, Ex. 35; Bower Dep., at 133:6-15, Ex. 5; CMS Manual System,

Pub. 100-04, Medicare Claims Processing Manual, Chapter 20, § 30.6 and § 130.7, Ex. 58.

118.    When capped patients were provided unnecessary oxygen, they were

usually given a single tank.  *See* DelBiondo Dep., at 96:10-17, Ex. 8; Rabassa Decl., ¶¶ 4, 16.

119.    Pursuant to instructions from their center manager Relators Germano

Lima and Roberto Rabassa personally delivered portable oxygen tanks to the following

Marlborough customers on the list set forth below. In each case the customer did not order or

need the portable tank.  In the case of J.B., full tanks were exchanged for full tanks.  In the other cases, a single E tank[7] was swapped out for a concentrator back up tank but billed as a portable oxygen delivery.  Delivery tickets for these deliveries were turned in and processed pursuant to the usual procedures Lincare used for billing for goods and services delivered by service representative. All of the customers listed below were Medicare beneficiaries.

| | |
|---|---|
| J.B. of Marlborough , MA | 6/8/09 |
| | 9/9/09 |
| R.H. of Holliston, MA | 3/3/09 |
| | 6/16/09 |
| | 9/15/09 |
| B.R. of Holliston, MA | 5/12/09 |
| | 7/21/09 |
| | 9/29/09 |
| S.S. of Framingham, MA | 3/31/09 |
| M.Z of Southborough, MA | 5/18/09 |

Declaration of Roberto Rabassa ("Rabassa Dec."), ¶¶ 5, 8-13; Declaration of Germano Lima ("Lima Dec."), ¶¶ 4, 8; Ex. 210 (Delivery Ticket dated 9/19/09, LINCARE0189039); Ex. 195 (Customer Oxygen Fill Histories, LINCARE0002532-LINCARE0002546).  In connection with the deliveries to customers J.B. and S.S., Lincare has produced Accounts Receivable History reports which evidence Lincare submitting E0443 claims (content fills) to Medicare for those customers for the deliveries describe above.  *See* Ex. 217 (LINCARE0202893 and LINCARE0203228).

---

[7]     An "E" tank is used as a backup tank and is larger than other tanks.  *See* Rabassa Dep., at 234:12-15, Ex. 31.

120.     Rabassa attempted to deliver a portable tank to customer L.H. of Framingham, MA, another person whose name appeared on the content fill list.  L.H. refused to accept any portable oxygen from Rabassa, stating that she did not want a new oxygen tank. Rabassa informed Mary Sweet who said she would go to L.H.'s home and deal with her directly. Sweet later told Rabassa that she got L.H. to accept a tank and Lincare's records show that L.H. portable received a tank on 3/21/09. L.H. was a Medicare beneficiary. Rabassa Dec., ¶¶ 5, 15; Ex. 195 (LINCARE0002537).

121.     Additionally, single tank deliveries of E tanks were made to the following Marlborough customers that were inconsistent with their prior history of tank usage on the following dates. These customer's names appeared on the content fill list for the Marlborough Center and the service representatives would have been instructed to deliver tanks to them. The single tank E deliveries most likely represent improper swap out of back up tanks. All of these customers were Medicare beneficiaries.

|  |  |
|---|---|
| C.C. of Natick, MA | 3/19/09 |
|  | 7/2/09 |
| M.W. of Framingham, MA | 3/19/09 |
|  | 6/11/09 |
|  | 9/10/09 |

Rabassa Dec. ¶ 17; Lima Dec., ¶ 12; Ex. 190 (Content Fill Lists, LINCARE0002054-LINCARE0002055); Ex. 194 (Spreadsheet of Capped Oxygen Customers, LINCARE0002531); Ex. 195 (Customer Oxygen Fill Histories, LINCARE0002532-LINCARE0002546); Ex. 192 (Hi-Pressure Oxygen Deliveries List from 9/2008 through 2/2009, LINCARE0002114-LINCARE0002228).

122.    At the time these deliveries were made, Medicare reimbursed Lincare $77.45 for each content fill (E0443) it presented to it.  Landrum Report, ¶ 105, fn. 70, Ex. 43.

123.    Lincare also used a monthly report it generated and circulated called the Content Fill Compliance Trend Report.  *See* Traylor Dep., at 96:10-20; 97:22-24; 98:1-10, Ex. 37; Bower Dep., at 139:3-17, Ex. 5.  This report tracked what percentage of customers on the Content Fill Management Report received a billable fill or portable oxygen.  *See id.* and Traylor Dep., at 99:23-24; 100:1-14, Ex. 37.  Using this report, managers at all levels of Lincare were able to track and evaluate center and area managers to see how effective they were at getting billable content fills to their capped portable oxygen patients.  *See* Traylor Dep., at 101:8-24; 102:1-13, Ex. 37.

124.    E-mails between senior managers show that Lincare set targets for the percentage of content fills the centers, areas, and regions were expected to achieve.  *See* Ex. 135 (LINCARE0131863 (July 11, 2011 e-mail from Greg McCarthy to Steve Bower, Jim Campanella, Hal McCroskey, Mike Rees, Carlos Somoza, and Dan Vasilij discussing 80% target)); Ex. 206 (LINCARE0109038 (e-mail from Pete Mosby to Scott Traylor and others titled "Content Fill Compliance Trend Report" stating "I would think we could at least hit 75%)); Ex. 134 (LINCARE0129436 (July 17, 2011 e-mail from Neil Hardin titled "Content Fill Compliance Trend Report" stating "[i]f you are not at 80% you need to put a better system in place.")); Ex. 136 (LINCARE0131881) (document explaining the Content Fill Compliance Trend Report).  As made clear in these communications, Lincare required the regions, areas, and centers to provide billable fills to at least 80% (later 70%) of the customers on the lists.  Bower Dep., at 139:3-17, Ex. 5.

- 45 -

125.    Peter Mosby admitted that some portable patients would not need fills because they did not use much portable oxygen, and that those patients should not receive tanks. *See* Mosby Dep., at 89:4-15; 104:17-105:14; 115:17-25; 116:1-10, Ex. 27.  He added that Lincare did not know what percentage of portable oxygen patients did not require portable refills for this reason.  *See id.* at 115:21-116:10 (stating he is sure some patients use less than a tank a month, a tank a quarter, or a tank a year), Ex. 27.  Lincare set its performance and evaluation targets without regard to this, however, and thus without knowing if the targets could be met without delivering unnecessary fills.  Although centers were required to meet portable oxygen quotas, Lincare management admitted that there was no way to determine whether customers on the center fill management report actually required portable cylinders. Mosby Dep., at 126:8-13; 128:13-15, Ex. 27.

126.    Lincare's changes to its procedure for filling portable oxygen tanks for capped customers resulted in routine replacement of unused, full oxygen tanks, as demonstrated by the results of a number of Lincare compliance investigations.  For example, in October 2009 at the Marlborough, Massachusetts service center, Germano Lima and Roberto Rabassa both reported to Lincare's compliance department that they had been ordered by their center manager, Mary Sweet, to deliver portable oxygen tanks to all capped patients—regardless of whether the patients desired them.  *See* Ex. 193 (LINCARE0002484-87 (October 28, 2009 memorandum from Germano Lima to Deborah Dillon-Sarra regarding Ms. Sweet's instructions)).  Tactics to deliver unwanted tanks included exchanging full tanks for full tanks and replacing back up tanks and then billing them as portable tanks.  *See id.*  Ms. Sweet also told Messrs. Lima and Rabassa

that if they did not provide a portable to every patient on the cap fill list, the center would lose money.  *See* Rabassa Dep., at 200:2-14, 201:6-17, Ex. 31.

127.     Ms. Sweet's instructions were to deliver tanks to patients no matter what and even if the patients did not want it.  *See* Lima Dep., at 69:15-24; 70:1; 73:7-16, Ex. 21. Rabassa Dep., at 204:23-24, 205:1-11 (instructing employees to return to customers' homes even after patients indicated they did not want oxygen), Ex. 31.  She also told employees to replace backup oxygen tanks — even if they were full — and bill it as a portable fill. *See* Rabassa Dep., at 206:4-9; 214:6-12; 215:5-12, Ex. 31.  Ms. Sweet also suggested that employees go to a patient's house and perform a concentrator check, but while there, also drop off a portable tank. *See* Rabassa Dep., at 204:19-22, Ex. 31.

128.     The allegations were investigated personally by compliance investigators Deborah Dillon-Sarra and Jenna Pedersen and substantiated.  Dillon-Sarra Dep., at 56:7-9; 85:23-25; 86; 87:1, 140:23-25; 141:1-3, Ex. 10; Ex. 78 (Marlborough Investigation Notes (Ex. 6 to Dillon-Sarra Dep.)).

129.     At the Boise, Idaho service center in February 2011, compliance officer Melissa Hite was investigating whether a delivery ticket had been improperly altered, when a service representative describing his normal job responsibilities informed her that when patients names were on the cap fill report (a report that lists all capped patients for whom Lincare can be reimbursed if they provide a new tank of oxygen) "he provides the a new tank (regardless of whether or not they need them)."  *See* Ex. 143 (LINCARE0192838).  If patients told him they didn't want a tank, he would tell them that "the computer told them it was time & they needed to

replace their oldest tank." *Id.* When Hite and Jolanda Mackey, the national compliance officer discussed what they learned with the employee's center manager, Ryan McCloud, McCloud informed Hite and Mackey that "90 % of the time they are not swapping out empty tanks." Ex. 143 (LINCARE0192837); Ex. 144 (LINCARE0192842). There was no discipline or corrective action taken. The only thing that occurred was that the Area Manager went to the center to discuss the proper procedure. Ex. 144 (LINCARE0192839). The center manager prepared a written memorandum with the correct procedure. Ex. 143 (LINCARE0192837).

130.    On November 13, 2009, a former employee told a Lincare area manager that the center manager in Glasgow, Kentucky "was instructed by the senior service rep to replace full tanks with full tanks." Ex. 128 (LINCARE0124926). By the time an investigator went to the site, in January 2010, the center was no longer engaging in the conduct. However, one driver admitted that prior to August/September "he misunderstood" and "thought each pt must get tank that mo(nth)." He received "clarification" at some point. Ex. 126 (LINCARE0124862). The center manager, Donna, confirmed that the driver "didn't know it (the portable tank) has to be empty, thought all pt had to have tank fills." Ex. 127 (LINCARE0124863). Because the center was now operating under the correct rules, the compliance officer, Melissa Hite, found no evidence of wrongdoing in her compliance log. *See* Ex. 149 (LINCARE0196923). No refunds were paid for the period Lincare was not following the proper procedures. And no written policies or procedures were circulated. *See id.*

131.    In November 2010, Lincare compliance learned that centers in Auburn, NY and Syracuse, NY were also delivering portable tanks to capped patients regardless of whether they needed them or not. Warnings were issued to both center managers. *See* Ex. 148

(LINCARE0196799-800); Ex. 162 (LINCARE0222960-62).  When the Area Manager, Charles

Galuilo, was interviewed by Compliance about the policies, he told the investigator that he was

"never told 'NOT' to do it, but never really was talked about it."  Ex. 170 (LINCARE0260619).

Yet despite substantiation, no effort was made to determine which tanks were improperly

switched or how much money was owed back to Medicare.  The compliance officer's log recites

that no refunds were repaid because of the misconduct.  *See* Ex. 148 (LINCARE0196800).

Lincare sent no notice to other center, area, or regional managers that this conduct was not

permitted, and made no attempts to investigate whether the same conduct was occurring in other

areas.  *See id.*

132.    A similar investigation took place at Lincare's Vincennes, Indiana center.

Lincare was notified by Department of Labor of Sarbaness-Oxley complaint made by former

employee who claimed he was terminated because of whistleblowing.  Ex. 232

(LINCARE0192924).  Employee said they were required to deliver oxygen to capped patients

every 90 days to qualify for content fills regardless of whether patient needed or requested

portable oxygen.  If patient hadn't used portable oxygen reps were instructed to replace the

concentrator back up tank and then bill for portable oxygen.  (Back up tanks are part of

stationary system and cannot be billed for, even when tanks are replaced).  Ex. 145

(LINCARE0192927-99).

133.    Compliance substantiated the allegations.  Interview notes support that the

alleged conduct occurred, and that it was ordered from higher corporate officials, including the

area manager and the RBCO.  *See* Ex. 145 (LINCARE 0192966-68); Ex. 145

(LINCARE0192969); Ex. 145 (LINCARE0192975); Ex. 145 (LINCARE0192977-82).

134.     In response to the Department of Labor investigation, Lincare lied about what they found.  In a letter to the Department of Labor dated October 29, 2009, in its discussion as to whether the company had in fact engaged in the alleged improper conduct, Lincare claimed that its investigation found "no indication that the center personnel were treating contents fills for oxygen patients with capped equipment any differently than contents fills for oxygen patients with equipment that was still billing."  *See* Ex. 151 (LINCARE0200930-34).  This was false. The interviews make it clear that the center's "Immediate Fill" policy was directed only to capped oxygen patients.  *See* ¶ 133 (above).

135.     Lincare also misled the OIG about the incident.  Lincare was require to report the incident to OIG pursuant to its Corporate Integrity Agreement, but its disclosure of the incident, on October 26, 2009, is deceptive.  *See* Ex. 161 (LINCARE0217743-44).  It does not identify the compliance problem raised by the Department of Labor complaint—that Lincare had knowingly billed Medicare for unnecessary portable oxygen fill and replacement of back up tanks—and informs OIG that any problem arose due to "initial confusion regarding the documentation required for submission of claims for oxygen contents."  *See id.*  The internal investigation had nothing to do with documentation — it had to do with improper billing.

136.     Lincare also investigated improper portable fills in Sebring, Florida. Although compliance confirmed that service representatives were instructed to provide fills to capped customers regardless of need, Lincare ultimately concluded that the allegations were not substantiated because there was no indication of wrongdoing.  Ex. 212 (LINCARE0192901-0192922).

137.    At a separate Lincare location in Virginia, Lincare's compliance department received a report from Michael DelBiondo that an Area Manager, Molly Wiseman, had instructed center managers to deliver portable tanks to every customer on the content fill management report, regardless of the customer's need or desire to receive portable tanks.  *See* Ex. 208 (LINCARE0156840); Ex. 139 (LINCARE0156857).  In an e-mail, and in response to Mr. DelBiondo's explanation that some patients did not need tanks, Ms. Wiseman stated that it "Doesn't matter.  You HAVE to at least [switch out] . . . . . it is the way you approach.  [Switch out] the [back up] !!!  If nothing else, do [concentrator] check and [switch out] [back up]!"  Ex. 208 (LINCARE0156841). Other e-mails contained similar admonitions.  *See id.* at (LINCARE0156841-48).

138.    Wiseman repeatedly emphasized how fills needed to be done, without exceptions.  *See* Ex. 133 (LINCARE0127245-50); Ex. 130 (LINCARE0127103-08); Ex. 152 (LINCARE0201181); Ex. 73 (DELBIO0238 – Delbiondo ___ Ex. 23); Ex. 70 (DELBIO0233). Wiseman even instructed her direct reports that, at a minimum, the staff must swap out the back-up tank in order for Lincare to log an unneeded capfill.  *See* Ex. 71 (DELBIO0235); Ex. 105 (LINCARE0018539); Ex. 72 (DELBIO236); Ex. 139 (LINCARE0156857).  Molly Wiseman told DelBiondo that "not needed" was not an acceptable reason for not delivering a portable oxygen tank to any patient on the cap fill list, unless the patient had recently been set up and was not capped.  *See* Ex. 71 (DELBIO0235).

139.    Following an investigation, and interviews with each of the seven center managers under Ms. Wiseman's management, the accusation was substantiated and Ms.

- 51 -

Wiseman was terminated. Ex. 142 (LINCARE0156922-23); Ex. 139 (LINCARE0156854-60); Ex. 140 (LINCARE0156900).

140.     At the conclusion of the investigation, Lincare determined that it needed to refund Medicare for the improper portable fills that occurred in Wiseman's centers.  Ex. 141 (LINCARE0156912-14).  Lincare recognized that most of the improper fills were likely single tank deliveries, and Scott Traylor circulated a list of all single tank deliveries that had been made to Wiseman's center managers with instructions that they review the delivery history with their staff to determine which fills were "likely inappropriate."  Ex. 141 (LINCARE0156914). Following this, Lincare refunded the reimbursement it had received on account of the identified single tank deliveries.

141.     As made clear in the preceding investigations, except for Syracuse and Auburn, New York, the reported misconduct is occurring in unrelated centers.  This indicates that the conduct is endemic throughout Lincare.  *See* Ex. 112 (LINCARE0054690) (list of known investigations into the fraudulent delivery of portables).

142.     Similarly, for all of these investigations (with the exception of the investigation into Ms. Wiseman's conduct), Lincare did not process refunds for inappropriate portable billing that it knew occurred.  *See* ¶¶ 126 to 140 above.

143.     But OIG's compliance program guidance state that once a violation has been found, then immediate corrective action must be undertaken, including any repayment of overpayments.  *See* Little Rpt., App'x B, at 36389, § g.3, Ex. 48.  While Lincare may have

responded to the incidents described above, it never instated a corrective action plan to make sure the behaviors did not reoccur.  *See* Bloink Rpt. at 20, Ex. 40.

144.   While the improper portable deliveries were occurring on a national level, Lincare also failed to investigate how extensive the problem may have been.  *See* Bennett Dep., at 28:23-30:20, 31:19-23, Ex. 3; Dillon-Sarra Dep., at 98:6-22, Ex. 10.  This is also in violation of OIG compliance program guidance, which requires suppliers to conduct internal auditing and monitoring.  *See* Little Rpt., App'x B, at 36385, Ex. 48.

145.   Managers failed to adequately train their employees about servicing capped Medicare beneficiaries who received portable oxygen.  *See* Ex. 129 (Ex. 23 to Gangemi Dep.); Ex. 85 (RRAB 0405); Ex. 235 (LINCARE0192866).  This was inconsistent with Jenna Pedersen's characterization of Lincare's compliance philosophy after the CIA expired: "Lincare concluded it was more effective and efficient to structure its Compliance program based on training."  *See* Dkt. No. 138 (Pedersen Affidavit Para 20)

146.   Lincare also failed to instruct employees on a national level on proper portable oxygen solicitation.  *See* Bower Dep., at 111:20-115:3, Ex. 5; Filo-Loos Dep., at 240:11-15; 241:20-242:2, Ex. 12; DelBiondo Dep., at 108-13-109:3; 110; 13-25, Ex. 8; Traylor Dep., at 167:14-169:5, Ex. 37; Mosby Dep., at 117:16-118:8, Ex. 27; McCarthy Dep., at 101:4-18, Ex. 25.  Lincare never identified risk areas or provided trainings that would have assisted in the development of better policies and procedures in order to prevent and detect improper portable cylinder deliveries to capped customers.  *See* Bower Dep., at 114:3-115:3, Ex. 5; Dillon-Sarra Dep., at 251:14-19, Ex. 10.  This is again in violation of OIG guidance requiring written

- 53 -

guidance to employees on how to perform their jobs when dealing with conduct that raises potential compliance concerns. *See* Little Rpt., App'x B, at 36372, Ex. 48.

147.    Relators' expert, Mary Beth Landrum, Ph.D., analyzed the data records Lincare produced that were responsive to Relators' Portable Oxygen query. Those records identified Medicare customers in Lincare's current database on whose behalf Lincare had filed at least one Medicare claim for a content fill during the period the customer's oxygen benefits were capped. For each such customer, Lincare produced data records relating to all content fill claims filed in connection with the customer, the claims Lincare filed with Medicare for portable oxygen rental; the dates portable oxygen cylinders were delivered to these patients in both capped and uncapped periods and the amount of cylinders delivered on each date; and the reimbursement Medicare paid Lincare for the content fill and portable rental claims. *See* Landrum Report, ¶¶ 50-51, Ex. 42.

148.    For each customer for whom records were produced, Dr. Landrum attempted to compare the portable oxygen deliveries (and the quantity of tanks delivered) in the capped period, with the portable oxygen deliveries (and quantity of tanks delivered) to that customer in the periods when oxygen deliveries were not capped, either before or after the cap period. *See* Landrum Report, ¶¶ 53-54, Ex. 42.

149.    Lincare, however, in the ordinary course of business archived portable oxygen claim and delivery records, even for current patients. Because a majority of the data was produced for deliveries between 2013 and 2015, for many of the customers whose records were produced, Dr. Landrum did not have sufficient delivery history to make a meaningful

comparison.  If Lincare is ordered to produce its archived data records, sufficient data records would be produced to permit analysis of most of those customers whose incomplete delivery records precluded analysis.  *See* Landrum Report, ¶¶ 77-80, 121-22, Ex. 42; Revised Supplemental Landrum Report, ¶ 25, Ex. 44.

150.    For those portable oxygen patients whose records Dr. Landrum could analyze, the rate of portable tank delivery in the capped period rose many times over the same customers' tank usage in the uncapped periods.  For customers who received, on average less than a tank every two months, the rate of tank delivery rose almost 450%.  Customers who had received less than a tank a month when their benefits were not capped, received, on average, more than four additional tanks every six months when their oxygen benefits were capped.  However, when customers' oxygen benefits were no longer capped, their rate of cylinder delivery returned to baseline, on average one cylinder every three or four months.  A chart of the average number of cylinders delivered to low usage portable oxygen customers (< one cylinder per month) during capped and uncapped periods is set forth below.



Landrum Report, ¶¶ 89-90, Ex. 42; Revised Supplemental Landrum Report, ¶¶ 27-29, 35-37,

Figure 1B and Tables 5 and 6, Ex. 44.

151.    Dr. Landrum performed several regression analyses upon the tank delivery

data, including analyses of those periods when Lincare had no financial incentive to increase

portable tank delivery.  Those analyses showed that over time, with no financial incentives, rates

of portable tank delivery actually decreased.  This drop reversed sharply after the cap date.  The

regression analyses show very high correlation between increased reimbursement and tank

delivery, that the changes in the delivery rates were unlikely to have occurred by chance, and the

much higher delivery rate during the capped period was most likely the result of a systemic

change initiated by Lincare.  The increased deliveries during the capped period were consistent

with the allegations of unnecessary content fills.  Further, the increases in tank delivery during

the capped period (and the corresponding decreases at the conclusion of the capped period) were

likely not caused by the customers' changing medical needs.  Landrum Report, ¶¶ 91-96, Ex. 42;

Supplemental Landrum Report, ¶¶ 35-39, Ex. 43.

152.     Dr. Landrum examined low usage portable oxygen patients to quantify how many excess portable oxygen deliveries these patients received.  For each identified patient, she compared the delivery history in the capped period to the history of portable tank delivery before and after oxygen benefit capping.  She found that 3,603 customers likely received unnecessary capped content fills and that Lincare presented 23,425 claims to Medicare for these unnecessary oxygen fills, at a cost to the United States of $1,325,689.  *See* Supplemental Landrum Report, ¶ 30-31, Ex. 43.

153.     Dr. Landrum also used an alternative method to calculate damages— identifying in the Concentrator Query data records single tank deliveries that were inconsistent with the customer's prior tank delivery history.  This method was consistent with the methodology used by Lincare to calculate damages when it determined that an area manager had improperly required centers to deliver portable oxygen tanks to customers who did not need or request new cylinder deliveries.  3,170 customers had single tank deliveries in the capped period that were inconsistent with their delivery histories in the non-capped periods and Lincare presented 15,263 claims for such deliveries, at a cost to the United States of $744,226.  *See* Landrum Report ¶¶ 98-103, Ex. 42.

## LINCARE'S RETALIATION AGAINST RELATORS

### SallyJo Robins

154.     SallyJo Robins repeatedly tried to correct improper billing practices at Lincare and educate/re-educate the service center staff.  *See*, *e.g.*, Ex. 182 (ROBINSDUNLAP0002075); Ex. 173 (ROBINSDUNLAP0000435-42); Ex. 209 (LINCARE0161550-51); Ex. 174 (ROBINSDUNLAP0000918-23); Ex. 77

(ROBINSDUNLAP0007254).  And she repeatedly raised valid compliance concerns.  *See* Ex.
214 (LINCARE0194196); Ex. 160 (LINCARE0217590-0016 - 17); Ex. 189
(LINCARE0001342); Ex. 220 (LINCARE0228433); Ex. 198 (LINCARE0016315-16); Ex. 137
(LINCARE0155770-98, at 97).

155.    Robins routinely informed Lincare about flaws in the customer
inactivation process, billing after pick-up, and holding pick-up tickets.  *See* Robins Decl. ¶ 29.

156.    In 2010, Vanessa Hager, Lincare's Compliance Investigator, and Jolanda
Makey, Lincare's then-National Compliance Manager, asked Robins to send them examples of
non-compliance as Robins learned about them.  *See* Robins Decl. ¶ 30.

157.    In accordance with their instructions, Robins sent numerous examples of
non-compliance to Lincare's Compliance Department, including instances of failing to respond
timely to a customers' requests for a pick-up of their equipment, failing to inactivate on a timely
basis accounts of customers who had been transferred to a nursing facility, and failing to
inactivate accounts after the equipment had actually been picked-up.  *See* Robins Decl. ¶ 31.

158.    On June 8, 2012, Robins sent Hager the example of customer AR (account
no. 013-790-006 903) where the service center did not pick-up the equipment until June 5, 2012,
even though the customer had asked for a pick-up at the end of May.  As of June 8, 2012, Robins
noted that the customer's account was still active.  *See* Ex. 188 (ROBINSDUNLAP0008324).

159.    In an email to Hager on July 6, 2012, Robins sent the example of customer
RR (account no. 003-140-011 258) where the customer's equipment was picked-up on June 28,

but the customer wasn't inactivated until July 5, 2012.  Robins noted to Hager that this customer

is "an example of where they [pick-up] equip [sic] before month end and then no innact acct [sic]

until the next month.  [N]ot mcr [sic] so no refunds due but it is not uncommon that they do not

use [the] correct date to inactivate the acct [sic]."  Ex. 187 (ROBINSDUNLAP0008178).

160.    In another e-mail communication with Hager on July 30, 2012, Robins

stated that "[t]he centers are still not inactivating accounts when they should or sometimes for

the correct date when they discover the acct [sic] should have been previously inactivated."  Ex.

186 (ROBINSDUNLAP0008173).

161.    In an email dated October 2, 2012, Robins sent Hager the example of

customer CM (account no. 013-770-004 226) where the customer's daughter told a Lincare

employee that she had been trying to get the customer's equipment picked-up since 2009,

without success.  Ex. 180 (ROBINSDUNLAP0001948-49).

162.    In an email dated October 19, 2012, Robins sent Hager the example of

customer ER (account no. 000-492-097) where the service center received the physician's

discharge order on December 28, 2011, but no one communicated this information to the RBCO

until October 2012.  Ex. 181 (ROBINSDUNLAP0001950-51).

163.    While Robins was disclosing and attempting to stop the unlawful conduct

described above, she was also copying or printing documents reflecting examples of such

conduct.  *See* Robins Decl. ¶ 32.  Robins did this for the instant *qui tam* action against Lincare.

*See id.*  Ms. Robins believed in good faith that Lincare engaged in conduct that was unlawful

and, thus, disclosed relevant PHI to her attorneys to be used in this FCA case.  *See id.*

- 59 -

164.     Robins and Dunlap served their First Amended Complaint on May 21, 2013 as to Lincare, and on May 23, 2013 as to Holdings.  *See* Orig. Mass. Dkt. # 1:12-cv-11707-DPW Dkt. #s 55, 57, and 58.  That First Amended Complaint listed examples of patients as to whom Lincare fraudulently billed Medicare at paragraphs 51, 59, 66, and 68.  *Id.*, Dkt. #55.

165.     Accordingly, at the time that Lincare terminated Robins on June 20, 2013, *see* Adams Dep., at 79:23-25, 80:1-4, 84:23-25, Lincare had already been served with the complaint a month earlier, and knew about Robins' use of its customer information because of the examples of fraudulent billing contained in that pleading.  Specifically, many of the copied documents or print-outs obtained by Robins were directly incorporated into the complaint.  Dkt. #55 at ¶¶ 51, 59, 66, 79, and 113.

166.     Lincare's stated basis for its termination was that Robins had removed protected health information from Lincare in violation of the Health Insurance Portability Accountability Act ("HIPAA").  This basis was made clear in a meeting between Paula Adams, Maureen White, and Ms. Robins in Buffalo on June 20, 2013.  *See* White Dep., at 102:19-23, 103, 104, 105:1-14, Ex. 39.  At that meeting, Ms. Adams asked Ms. Robins whether she had taken Protected Health Information ("PHI") outside of Lincare.  White Dep., at 104:12-25, 105:1-2, Ex. 39.  When Ms. Robins indicated that she had, Ms. Adams immediately informed her that she was terminated from Lincare.  Adams Dep., at 80:7-17, Ex. 1.

167.     Before Paula Adams was sent to question Ms. Robins about PHI, Ms. Adams first met with Lincare's General Counsel and its CEO.  *See* Adams Dep., at 71:19-74:17, 77:11-15, Ex. 1.  The day before Adams met with Robins, Adams even wrote herself a note,

noting her plan to "confront" Ms. Robins about "PHI." *Id.* at 78:14-21.  Of course, Ms. Adams

was planning to terminate Ms. Robins if Ms. Robins admitted to removing PHI without

explanation, and Ms. Adams acknowledged that she didn't even know what a reasonable

explanation would be. *Id.* at 81:3-14.

168.    Counsel for Ms. Robins alerted Lincare's counsel to the fact that her

termination was unlawfully based on HIPAA — to no avail.  *See* Ex. 49 (Adams Ex. 21).  But

HIPAA contains an exception — applicable here — to the general requirement of non-disclosure

of protected health information.  This exception allows an employee of a "covered entity" (such

as Lincare) to disclose protected health information if the employee believes in good faith that

the covered entity engaged in conduct that is unlawful and if the disclosure is to an attorney

retained on behalf of the employee or to a government agency authorized to investigate the

covered entity.  *See* 45 C.F.R. § 164.502(j).

169.    Lincare's Handbook provides for review of challenged termination

decisions.  Despite counsel's letter on her behalf, Ms. Robins was afforded no such review.  *See*

Ex. 74 (ROBINSDUNLAP 0001056), at 18-20.

**Kathleen Dunlap**

170.    Lincare fired Kathleen Dunlap twice for her frequent disclosures of the

fraudulent practices occurring at Lincare.  *See* White Dep., at 117:15-18, 122:9-15, Ex. 39;

Dunlap Decl. ¶ 3.

171.    On December 29, 2007, Lincare fired Dunlap for the first time.  *See* White

Dep., at 117:15-18, Ex. 39; Dunlap Decl. ¶ 4.  Lincare took this action in retaliation for Dunlap's

bringing several frauds to the attention of Melissa Hite (now Gibson), a Lincare Compliance

Officer.  *See* White Dep., at 114:12-115:10, 19:1-6, Ex. 39.

172.    This termination was triggered by Dunlap faxing of examples of the frauds

described above to Gibson.  Dunlap Decl. ¶ 5.  A few weeks after Dunlap's faxes, Maureen

White, Lincare's Amherst, New York Regional Billing Manager, fired Dunlap.  White Dep., at

117:15-18, Ex. 39.  In Dunlap's termination notice, White specifically references "a fax [that]

was sent to the Compliance Department that was part of a file [Dunlap] ha[d] been holding on

substandard workmanship and other issues with Center employees" as a basis for her

termination.  Ex. 88 (ROBINSDUNLAP 0007423-24).

173.    Dunlap contacted Sheila Dilley, a Holdings employee who had been

assigned significant HR responsibilities for Lincare to complain about her termination.  *See*

White Dep., 118:2-12, Ex. 39; Dunlap Decl. ¶ 6.  Dilley instructed Dunlap to contact Phil Phenis,

a director of finance at Holdings, who called Dunlap, apologized, and ultimately rehired her

beginning in January 2008.  *See* White Dep., 118:2-12, Ex. 39; Dunlap Decl. ¶ 6.

174.    After she was re-hired, Dunlap continued to report instances of fraud to

Lincare's Compliance Department, both in connection with Lincare's required periodic

compliance survey and on her own, apart from her normal job responsibilities, in an effort to

identify and stop further violations of the FCA.  *See* Makey Dep., at 166:5-25, 167:1-3, Ex. 24;

White Dep., at 121:5-18, Ex. 39; Hite Dep., 96:22-25, 97:1-11, Ex. 17.  Examples that Dunlap

sent to Gibson included instances of Lincare billing Medicare after a customer's equipment was

picked-up; Lincare billing Medicare when the customer was in a nursing facility; and Lincare

billing Medicare after a customer had requested a pick-up of equipment. *See* Dunlap Decl. ¶ 8.

175.   Moreover, in 2009, Dunlap told Gibson that she received almost one call

per day about instances of billing past a customer's inactivation date. *See* Dunlap Decl. ¶¶ 9.

Dunlap said that she believed this was a company-wide problem. *Id.*

176.   In 2009, Kathleen Dunlap provided Lincare examples of billing after the

inactivation date. *See* Ex. 75 (ROBINSDUNLAP0001118); Ex. 149 (LINCARE0196910-11).

177.   But employees in Lincare's Compliance Department were becoming

frustrated at Dunlap's frequent disclosures and, in or around April 2010, they began telling her

that she should limit the information she reported to examples of "intentional and malicious"

overcharges to third-party payors, including the government. *See* Pedersen Dep., at 182:17-

183:17, Ex. 28; White Dep., at 127:9-128:18, Ex. 39; Dunlap Decl. ¶ 10.

178.   Specifically, on April 13, 2010, Dunlap met with Maureen White and

Deborah Dillon-Sarra, a Lincare employee in the Compliance Department.  Dillon-Sarra and

White attempted to convince Dunlap that the examples she had been sending to the Compliance

Department were simply innocent mistakes. *See* White Dep., 123:17-23, 124, 125, 126, 127:1-8,

Ex. 39; Dunlap Decl. ¶ 11.

179.   Dunlap then had another meeting with Maureen White on April 14, 2010.

She asked White if she should have sent the example of Lincare customer TM (account no.

004-430-003 898) to the Compliance Department. *See* Dunlap Decl. ¶ 12.

180.    TM involved a situation where the center manager asked Dunlap not to inactivate the customer because it would affect the center manager's numbers.  Dunlap Decl. ¶ 13.  White said that Dunlap should not have sent this example and, moreover, White said that Dunlap should never determine if accounts should be inactivated nor should she try to figure out if there is an overbilling.  White ended the meeting by saying that this job may not be for Dunlap.  White Dep., at 127-131, Ex. 39; Dunlap Decl. ¶ 13.

181.    The next day, Dunlap had a phone call with Deborah Dillon-Sarra, who said that, in the future, Dunlap should send only "intentional and malicious" errors to the Compliance Department.  *See* Dunlap Decl. ¶ 14.  When Dunlap brought up the TM example, Dillon-Sarra said that it should not have been sent to compliance because "that's heard all the time."  She also said that it is not Dunlap's place to decide whether an account should be inactivated.  *See* Ex. 185 (ROBINSDUNLAP0007221); Dunlap Decl. ¶ 14.

182.    According to Lincare's compliance investigator Deborah Dillon-Sarra, in an April 15, 2010 email to her boss, Jenna Pedersen, she said that had spent time with Kathleen Dunlap and was surprised that Ms. Dunlap "still cannot grasp the difference between malicious and intentional compliance issues and data entry errors . . . ."  Ex. 225 (LINCARE0231385-86).

183.    At this time, Lincare's Compliance Department continued to hammer on Dunlap by drawing a distinction between "process errors/mistakes" and "fraudulent acts."  Ex. 225 (LINCARE0231383).  Lincare acknowledged that she was raising compliance issues, albeit ones that Lincare found to be without malice/intent.  *Id.*  Lincare advised Ms. Dunlap that she

- 64 -

needed to work issues "all the way through" before reporting them to the Compliance

Department.  *Id.*

184.    Then, on April 22, 2010, Dunlap attended a meeting with Relator Robins,

White, and Jenna Pedersen, a Compliance Officer in Lincare's Compliance Department.  The

purpose of the meeting was to discuss Dunlap's frequent disclosures to the Compliance

Department.  *See* Ex. 184 (ROBINSDUNLAP0006972-6973).

185.    During the meeting, Dunlap informed White and Pedersen that there was

significant overbilling at Lincare, and Dunlap tried to explain that there were so many instances

of billing problems that she did not know how she could appropriately limit the information she

reported.  *See* Dunlap Decl. ¶ 15.

186.    On July 15, 2010, in a further effort to identify and stop violations of the

Act, Dunlap went to White for the purpose of addressing specific examples of what Dunlap

believed to be fraudulent activity at Lincare.  That meeting began as a meeting to discuss her

concerns about compliance problems she was seeing at Lincare.  Ex. 106 (LINCARE0020936);

Ex. 150 (LINCARE0198365); Ex. 142 (LINCARE0160377).

187.    Ms. Dunlap felt passionately about the compliance issues she was raising

and was upset that Lincare wanted her to be quiet and overlook patterns of mistakes and other

holding pickup violations.  Dunlap Decl. ¶¶ 16, 17.

188.    White became frustrated at Ms. Dunlap's request and refused to address

the examples of overbilling that Ms. Dunlap had identified, saying only that they constituted

"process issues," as opposed to "compliance issues."  *See* Dunlap Decl. ¶ 18.  White became angry.  *See* White Dep., at 156:1-6, Ex. 39.

189.    Ms. Dunlap again told White that overbilling was pervasive throughout the company and that employees were not being held accountable for their improper actions.  *See* Dunlap Decl. ¶ 19.  White, however, refused to listen to Ms. Dunlap and then terminated her in retaliation for continuing to identify and stop instances of Lincare's fraudulent billing of third-party payors, including the government, pursuant to the frauds identified above.  *See id.*; White Dep., at 148:3-7, Ex. 39.

190.    Lincare's compliance program states that employees, like Kathleen Dunlap, must report actual *or perceived* violations.  *See* Ex. 98 (LINCARE0007493, at 96 (final paragraph), and at 99 (item A)).  Retaliation, in such circumstances, is prohibited.  *Id.* at LINCARE 0007500 (final bullet).  Lincare employees, like Ms. Dunlap, "had the right to disclose *a concern*," even if the employee didn't know, for sure, that there was indeed a violation.  *See* Hite Dep., at 56:17-57:2 (emphasis added), Ex. 17.

191.    After Ms. Dunlap was terminated, Ms. Dunlap informed Phil Phenis and Sheila Dilley, both of whom were Holdings employees, that she had been terminated after trying to discuss instances of non-compliance and billing issues with White.  *See* Dunlap Decl. ¶ 20. She also expressed to Phenis her frustration in coming across numerous instances of continuous overbilling of government agencies, private insurance, and customers.  *See id.*

192.    On August 5, 2010 — shortly after Lincare terminated her — Ms. Dunlap had a recorded phone call with Lincare's National Reimbursement Manager, Philip Phenis.  Ex.

___ (DOJ0000006).  During that call, Mr. Phenis reiterated Lincare's view that process errors and failure to follow protocols were not compliance issues.  *Id.* at 3, 6.  He pointed out that Lincare was a "high volume operation[ ]" and "everything doesn't run to perfection to meet what every policy would be."  *Id.* at 6.  He acknowledged that Ms. Dunlap was looking to do "the right thing," but then stated that she was "looking at everything in a very black and white and absolute scenario, and I don't think you are very flexible in your thoughts . . . ."  *Id.* at 6.  Next, he discussed "mistakes" and acknowledged that Lincare "do[es] see those a lot in our Company."  *Id.* at 7.  He stated that Lincare was "a large company now," and the mistakes are "something that we struggle with and process . . . ."  *Id.*  He again described Ms. Dunlap's views as "very black and white," but said "people make mistakes.  We as a company acknowledge mistakes.  We understand there are mistakes . . . ."  *Id.* at 8.  And when Ms. Dunlap described her concerns about improper inactivation, equipment pickup issues, and improper billings, Mr. Phenis responded that Ms. Dunlap was "not telling [him] something that [he] would say is new information . . . ."  *Id.* at 10-11.

193.    Lincare's own 2012 Compliance training document states that Lincare's policy is "black and white" — "[i]f it looks gray . . . stay away!"  Ex. 197 (LINCARE0016143-60, at 16).

## Germano Lima

194.    Germano Lima received high marks in his performance reviews and above average merit raises.  *See* Ex. 94 (LINCARE0001916); Ex. 93 (LINCARE0001906); Ex. 79 (LIMA0074 (performance observation)); Ex. 92 (LINCARE0001897); Filo-Lo0s Dep., at

305:21-308:9 (agreeing Mr. Lima's 7% raise was "very unusual" and "healthy" and above the 4.5% raise for which he was budgeted), Ex. 12.

195.     After the Medicare reimbursement changes in 2009, Lima was instructed that he was to do everything necessary to deliver portable tanks to customers on the Content Fill Management Report.  If customers did not need new tanks, he was supposed to replace full tanks for full tanks.  If customers did not want new tanks, he was expected to swap out the back up tank to the oxygen concentrator and get a ticket signed which would evidence the delivery of a portable tank.  If customers did not want new portable tanks, he was supposed to get them to sign for them anyway.  Lima tried to follow these orders until one customer, physically attacked him and accused him on engaging in Medicare fraud.  When Lima reported to this incident to center manager Mary Sweet, she instructed him to not leave the patient's home until she accepted a portable tank.  Lima Dep., at  45:3-46:6, 49:11-22, 62:15-19, 67:21-68:5, 69:15-21, 71:17-72:21, 73:7-22, 96:23-99-4, Ex. 21.

196.     After confrontations with patients who did not want to receive new portable oxygen tanks Marlborough service representatives informed Mary Sweet that they did not want to deliver portable tanks to patients who did not want them.  Sweet was unhappy with the refusal and described the service representatives' failure to deliver portable as "taking money out of her pocket."  Sweet informed the service representatives that if they were going to take money out of her pocket, "I will make sure it comes out of your pocket."  Rabassa Dep., at 205:12-206:2, Ex. 31.

197.    Sweet retaliated against the service representatives by changing the way service representatives were compensated when they took their vans home in order to be available to handle customer calls that came in during the night reducing their compensation. *See* Lima Dep., at 231:17-233:17, Ex. 21; Rabassa Dep., at 412:16-413:20, Ex. 32.

198.    When Lima learned that Rabassa had been discharged, Lima called Lincare's Compliance hot line to report that Rabassa had been fired in retaliation for complaining about fraudulent conduct at Lincare.  He also reported many improper practices at the Marlborough office including improper billing for portable equipment improper billing for oxygen concentrators, and Lincare's payment of kickbacks.  *See* Relators Lima and Rabassa's Consolidated Objections and Responses to Defendants' First Set of Interrogatories, Answers 2, 3, 7, and 12, Ex. 64; Lima Dep., at 235:12-237:22, Ex. 21; Ex. 97 (October 15, 2009 Compliance Investigation Form (LINCARE0002616)).

199.    A few days after Lima called Lincare Compliance to complaint about fraudulent activity, Lincare's Regional Vice President, Greg McCarthy visited Marlborough center accompanied by the Northeast Regional Manager, Steven Bower.  Lima asked to meet McCarthy and Bower.  He told them that he thought the action taken against Rabassa was retaliatory and described the instructions he had been given from Ms. Sweet regarding improperly filling portable oxygen tanks.  *See* Lima Dep., at 243:9-244:15, Ex. 21; Lima Int. Answers to Ints. 2, 3, and 12, Ex. 64

200.    During his meeting with McCarthy and Bower, Greg McCarthy stopped Lima and asked him if he was describing these matters because he was having a "financial

problem" and assured Lima that Lincare would pay him what he needed.  Lima told McCarthy

and Steven Bauer that he was not looking for money; rather he was simply reporting serious

compliance problems and Lincare's failures to comply with Medicare laws.  Lima became

severely anxious and tried to leave the meeting.  As he left, McCarthy and Bauer followed him

and told him not to discuss any of the matters they had just discussed with anyone else.  *See*

Lima Dep., at 245:20-246:2, 247:10-249:20, 253:7-255:11, 256:21-258:1, 258:8-23, Ex. 21.

      201.    During the meeting, McCarthy acknowledged that the conduct described

by Lima was fraudulent and illegal and Lima should have refused to take part in such activities.

Lima Dep. at 253:6-254:16, Ex. 21.

      202.    During the meeting with Lima and McCarty, Northeast Regional Manager

Steven Bower recognized that Lima was "stressed out" and had "too much on his plate."  Bower

recognized that Lincare needed to use some resources or take other steps to give the

Marlborough Center "a break."  Bower likely told the center manager, Mary Sweet, and the area

manager, Tara Filo-Loos, that the workload at the center needed to be adjusted.  *See* Bower Dep.,

at 170:4-15, 182:10-22, 188:3-9, Ex. 5.

      203.    A week later, during the week of October 26, 2009, Deborah Dillon-Sarra,

a Lincare Compliance Investigator, came to Marlborough to investigate the allegations made by

Rabassa and Lima.  Lima sent Dillon-Sarra a four-page letter outlining Lincare's improper

actions.  Among other things, Rabassa informed Lincare in writing that the center manager Mary

Sweet required the service representative to replace portable oxygen customers' tanks when they

were not empty; that deceit should be used in order to get the customers to sign delivery tickets

for portable oxygen, including improper replacement of back up tanks; that pick up tickets had

been held for deceased customers or other customers whose equipment had been picked up; that

the center had improperly initiated oximetry testing, and paid improper kickbacks.  He also

described what he had told McCarthy and Bower in their meeting.  *See* Lima Dep., at 274:2-9,

275:10-24, Ex. 21; Ex. 193 (LINCARE0002484-87).

      204.     Lincare never provided any resources to the Marlborough center to

remove the stress on Lima.  In fact, it removed resources after Rabassa complained of fraud to

McCarty and Bower.  After it terminated Rabassa, Lincare refused to fill Rabassa's position

requiring two service representatives to do the work of three.  Shortly thereafter, Lincare

transferred the more experienced service representative, Peter Morand, to another center and

replaced him with an individual who had no experience or ability to deliver liquid oxygen.  The

center manager and the area manager recognized the service representatives were understaffed

and stressed and the center was short a service representative position.  Even in late May of

2010, Filo-Loos disclosed to Cheryl Hoffman (later MacPherson), to whom she was offering the

Marlborough center manager job, that the center was understaffed and the whole center was

stressed, and that only one service representative was taking orders, as a new service

representative had just completed training.  *See* Lima Int Answers, Answer 2, Ex. 64;

MacPherson Dep., at 24:13-26:19, Ex. 23.

      205.     With Lincare's approval, Lima took college classes at night for which he

received tuition reimbursement from Lincare.  Prior to reporting fraudulent activity, there had

never been a conflict or problem with his schedule.  After he reported fraudulent activity,

knowing that he could not work certain nights, his supervisors repeatedly assigned him to be on

- 71 -

call the nights he had class.  When Lima protested and said he could not work those nights, his supervisors criticized Lima for unwillingness to work additional hours and take extra call shifts, giving him a poor evaluation.  *See* Lima Int Answers, Answer 2, Ex. 64; MacPherson Dep., at 96:14-98:2, Ex. 23; Ex. 92 (LINCARE0001897).

206.    By reducing the workforce by a third and replacing an experienced service representative with a representative who was barely qualified, Lincare made Lima's job much more difficult.  Lima's job performance unsurprisingly fell because he had far more to do than he had before and much more responsibility.  The center manager of the Marlborough center acknowledged that because the center was short staffed and the other service representative was inexperienced, the poor working conditions at the center impacted Lima's ability to be thorough or complete all of the work that had to be done.  *See* Lima Answer to Ints, Answer 2, Ex. 64; MacPherson Dep., at 89:17-90:16, 91:22-92:15, Ex. 23.

207.    Lincare placed spurious warnings in Lima's personnel file to provide a paper record to justify firing Lima.  The warnings were fictitious, reciting events that never occurred and reprimands that he never received.  For example, an August 14, 2008 Final Written Warning purports to document a warning about improper use of the company gas card that was supposedly given by center manager Heather Walker.  The purported Final Written Warning is not signed by either Ms. Walker or Lima.  Ex. 82 (LIMA 0116) (August 14, 2008 Final Written Warning).  Neither the center manager nor the area manager discussed Lima's fuel reports at the time of the purported warning or informed him that there was a problem with them.  Lima first saw the document when he requested his personnel files from Lincare after he was terminated. *See* Lima Dep., at 220:12-223:14, Ex. 21.

208.     Lincare HR policy requires Written Final Warnings to be signed by the manager giving the warning and the employee (unless the employee refuses to sign, which should be documented on the warning).  The signature requirements prove that the warning was given and that the employee received it.  Managers who fail to comply with the signature requirements are subject to formal discipline for violating company policy.  *See* Dilley Dep., at 71:19-75:18, Ex. 9.

209.     Another Final Written Warning found in Lima's Personnel File that he purportedly received is dated May 12, 2010.  The document recites that Lima had refused to deliver oxygen to a new customer after he had committed to making the delivery.  The warning stated that "unless there is an immediate and sustained improvement in your actions and behavior, further disciplinary action up to and including termination will occur."  The warning was supposedly written and delivered by Lima's then supervisor, Misty Miscoffian.  *See* Ex. 84 (LIMA 0124-25).

210.     The May 12, 2010 Final Warning is completely false and a forgery.  The incident the May 12, 2010 Final Warning purports to document never occurred. There was no refusal by Lima to make a delivery to a new customer.  Nor did Lima receive an oral, or written, warning from his supervisor.  The May 12, 2010 Final Warning is not signed by either Lima or Miscoffian, as required under Lincare HR policies, and Miscoffian's name is misspelled as "Moscoffien."  Ex. 64 (Lima Answers to Interrogatories, Answer 2); Lima Dep., at 286:9-288:20, Ex. 21; and Ex. 84 (LIMA 0124-25).

- 73 -

211.     In 2010, Lima's annual performance review was conducted in June, two

months earlier than in prior years.  The review was conducted by a new center manager, Cheryl

Hoffman, who had only become center manager two weeks earlier and was not trained on how to

perform an annual evaluation until a few weeks after she conducted Lima's review.  Hoffman did

not have any personal experience with Lima and could not evaluate his performance based on

what she had observed.  The review was mediocre and Hoffman admitted Lima that the area

manager, Tara Filo-Loos, had instructed her to give Lima a mediocre review.  Nonetheless, the

review acknowledged the stressed working conditions, noting "Gets his work done," "Gets his

route completed," and "Does not have time to be thorough."  Lima Answers to Ints, Answer 2,

Ex. 64; Lima Dep., at 33:15-35:4, Ex. 21; MacPherson Dep., at 7:10-8:5, 22:8-12, 28:16-31:12,

78:18-8:8, 83:22-98:3, Ex. 23; Ex. 92 (LINCARE0001897); Ex. 94 (LINCARE0001916); Ex. 93

(LINCARE0001906).

212.     Lincare terminated Lima's employment on June 28, 2010, at a meeting

attended by Lima, Tara Filo-Loos and Cheryl Hoffman.  The Employment Termination

memorandum, purporting to provide the grounds for Lima's termination was signed by Cheryl

Hoffman.  However, Hoffman stated that the decision was made by Lincare's HR department;

that she did not know that Lima would be terminated until the day of the termination, after she

received the memo from HR; and that she had no knowledge of Lima's possible termination

prior to that.  MacPherson Dep., at 98:19–100:3, Ex. 23; Ex. 91 (LINCARE0001762).

213.     According to the Employment Termination Memorandum, Lima was

terminated because he had continued to engage in behavior identified in the May 12, 2010 Final

- 74 -

Warning.  But, as noted above, Lima never received that warning nor was such any warning merited.  Ex. 91 (LINCARE0001762).

214.    According to the Employment Termination Memorandum, Lima had put off setting up a hospital bed on Friday, June 18.  However, Hoffman was on vacation that day and admits that she was out of the office and learned about the incident second hand. MacPherson Dep., at 33:12-34:14; 87:16-88:9, Ex. 23.  In fact, the customer had asked Lima to delay setting up the bed on the original date because the home wasn't prepared for the setup and the customer agreed to have the bed set up on Monday.  Lima Dep., at 88:13-89:9, Ex. 21.

215.    The other allegations of the Employment Termination Memorandum were false.  Lincare service representatives were given no "hard" date or deadline by which they were required to complete concentrator checks; they were normally performed at the convenience of the service representative within the required month, so that the representative could perform Lincare duties as efficiently as possible.  Lima Decl., ¶ 16.  Lima did not make a commitment to perform a concentrator check which he failed to honor on June 24, 2010.  *Id.*  Further, Lima did not intentionally miss any Nextel calls during that work day, and never intentionally missed calls during the day; to the extent he ever missed calls, it was frequently because he was driving, a time during which Lincare policies forbid him from answering phones.  Lima Decl., ¶ 15.

216.    At the termination meeting, Lima was not provided a copy of the Employment Termination memorandum, or permitted to rebut the alleged deficiencies.  He did not know what the grounds for termination were until he received a copy of his personnel file sometime after he was terminated.  At the conclusion of the termination meeting, as Lima went

- 75 -

to the door, his supervisor, out of Filo-Loos's hearing range, apologized to him.  *See* Lima Dep

291:13-292:8, 295:11-296:16, Ex. 21; Lima Answers to Int., Answer 2,  Ex. 64.

217.    As a result of Lincare's retaliatory action, Lima was unemployed for more

than two years, lost tuition reimbursement benefits that he had been using to obtain a college

degree, and is still not earning as much money as he made when he was employed by Lincare.

Lima Decl. ¶ 17.

**Roberto Rabassa**

218.    After oxygen reimbursement changes went into effect, Rabassa was

instructed by Mary Sweet, his center manager, to deliver portable cylinders to every capped

customer on the Center Fill Management Report.  Rabassa Dep., at 200:3-21, Ex. 31; Tettis Dep.,

at 114:6-115:1, Ex. 36.  Sweet said that, if portable cylinders were not delivered, it was "money

coming out of this center, this is money coming out of my pocket and this is money that will

come out of your pocket."  Rabassa Dep., at 201:6-13, Ex. 31.  The directive was clear:  Deliver

portables to capped customers, even if service reps had to resort to threats or replace full back-up

tanks and have customers sign fraudulent delivery tickets.  Rabassa Dep., at 206:4-207:6;

247:18-248:10,  Ex. 31; Morand Dep., at 84:5-10, 152:13-21,  Ex. 26.

219.    Rabassa initially followed instructions and swapped out full tanks and

provided unnecessary portables to customers.  Rabassa Dep., at 241:23-242:7; 244:8-23, Ex. 31.

However, as soon Rabassa realized the practice was improper he stopped providing unnecessary

portables or swapping full tanks for full tanks.  Rabassa Dep., at 242:8-242:20, Ex. 31.  Rabassa

voiced his opinion that such practices were improper – he told other service representatives and

Sweet that he would no longer deliver unnecessary portable cylinders to customers.  Rabassa

Dep., at 245:10-22, Ex. 31;  Rabassa Dep. (continuation), at 386:9-20, Ex. 32.

      220.    After informing Sweet of his concerns, Rabassa called Tarrah Filo-Loos,

the area manager, to complain about fraudulent billing and improper portable cylinder fills of

capped customers.  *See* Rabassa Dep., at 391:8-392:6, Ex. 32.  Filo-Loos responded that she

would come to the Marlborough center the following day to investigate Rabassa's complaints of

improper deliveries and billings.  Rabassa Dep., at 392:5-392:15, Ex. 32.  Although Filo-Loos

traveled to the Marlborough center the next day, she never spoke to Rabassa about his allegations

of fraud.  Rabassa Dep., at 396:4-17; 398:18-399:13, Ex. 32.

      221.    After Filo-Loos' visit to the Marlborough center, Sweet's attitude towards

Rabassa changed.  She assigned Rabassa to work the most demanding and menial warehouse

jobs, requiring him to mop and sweep the floors.  Rabassa Dep., at 408:17-409-12, Ex. 32.

Sweet also changed Rabassa's and the other service representatives' compensation.  Rabassa

Dep., at 412:1-22, Ex. 32.  Service representatives no longer got paid for making service calls

while on their way home.  *Id.*  Rabassa no longer was paid for driving a Lincare vehicle to and

from work when on call.  Rabassa Dep., at 413:3-20, Ex. 32.  Sweet told Rabassa that if he was

going to take money out of her pocket by refusing to pressure capped Medicare beneficiaries to

accept oxygen tanks they did not order – she would respond by taking money out of his pocket.

Rabassa Dep., at 413:12-20, Ex. 32.

      222.    Prior to this change, it was common practice for service representatives to

be paid for driving a Lincare vehicle to and from work after a night on call.  Rabassa Dep., at

- 77 -

414:20-415:3, Ex. 32; Ex. 81 (LIMA 0106).  Regardless of whether this vehicle policy was new,

Sheila Dilley, a Lincare HR Manager, conceded that enforcing a Lincare policy because an

employee reported a compliance violation after previously ignoring that same policy, would be

considered retaliation under Lincare policy.  Dilley Dep., at 96:24-98:24, Ex. 9.  True to her

word, she refused to authorize reimbursements to Rabassa that had been routinely paid to him.

Rabassa Dep., at 423:18-424:6, Ex. 32.

223.    Despite the retaliation suffered by Rabassa, his job performance did not

deteriorate, he remained a competent employee, and he received no customer complaints.  Sweet

Dep., at 199:6-200:1, Ex. 35.  Customer's "loved him," and supervisors never complained about

his work.  Coyne Dep., at 101:6-16, Ex. 7.

224.    During the week of September 28, 2009, after receiving a call from an

irate Lincare customer who complained that he was being improperly billed, Rabassa called the

Medicare fraud hotline to report Lincare's fraudulent Medicare billing practices.  Rabassa Dep.,

at 440:12-441:21, Ex. 32.

225.    After reporting the fraud to Medicare, Rabassa called Lincare's corporate

office.  Rabassa Dep., at 446:13-15, Ex. 32.  Rabassa spoke with Dilley, and relayed his

allegations of Medicare fraud.  Rabassa Dep., at 446:13-448:2, Ex. 32; Dilley Dep., at 12:12-19,

Ex. 9.  Rabassa told Dilley about the directive to deliver unnecessary portable cylinders to

capped customers, Lincare's illegal billing, and also stated that he had provided the same

information to the Medicare anti-fraud hotline.  Rabassa Dep., at 450:22-451:10, Ex. 32.

226.    After Sweet changed the longstanding compensation practices for after-hours use of the company vehicles when service representatives were on call, Rabassa asked higher level corporate officials whether the changes were appropriate, and whether the service representatives were covered by Lincare's automobile insurance when they drove the vans at night, but were not responding to a customer's call.  Rabassa Dep., at 419:22-421-21, Ex. 32; Ex. 86 (RRAB 0448).  Rabassa's inquiries about insurance and company policy were forwarded to Brian MacPhaiden, Lincare's Fleet Manager.  Ex. 89 (LINCARE0001548).

227.    Although the information was not relevant to the questions raised by Rabassa, after MacPhaiden learned that Rabassa had questioned the prior responses he had received from his superiors, MacPhaiden pulled fuel and mileage records relating to the Marlborough company vans.  He asked Sweet and Filo-Loos to review the reports and obtain an explanation why the fuel purchased does not match up with the odometer readings entered.  Ex. 89 (LINCARE0001548); Ex. 80 (LIMA 0104); Ex. 89 (LINCARE0001548); Ex. 90 (LINCARE0001753).  Filo-Loos personally undertook the investigation and analysis of Rabassa's fuel logs, while Sweet requested that Rabassa fill in the mileage of this report.  Rabassa Dep., at 456:14-457:18, Ex. 32; Filo-Loos Dep., at 299:2-20, Ex. 12.

228.    The records were not in good order, in large part because the gas cards Lincare used to track mileage and fuel did not properly function, did not account for the fuel vans used while idle, and service representatives often shared the gas card among different Lincare vehicles.  Rabassa Dep., at 462:4-21; 463:20-464:8,  Ex. 32; Morand Dep., at 100:1-22, Ex. 26.  The records had been kept in that manner for years and although Rabassa regularly submitted them, no one had previously raised questions to him about them or instructed him to

change his record keeping practices.  Rabassa provided an explanation for the entries.  Rabassa

Dep., at 456:13-457:18, Ex. 32.

229.    After reviewing the fuel and mileage logs, both the area manager, Filo-

Loos, and the regional manager, Steven Bower, believed Rabassa should receive a Final Written

Warning.  Ex. 89 (LINCARE0001548); Filo-Loos Dep., at 318:23-320:2, Ex. 12.  Sweet

concurred that appropriate discipline for Rabassa was a Final Written Warning.  Sweet Dep., at

221:9-222:1, Ex. 35.  This is consistent with Lincare's Employee Handbook which outlined a

series of progressive warnings that employees should receive before being terminated.  *See* Ex.

87, at 20 (RRAB 0812-44) (Lincare Employee Handbook).

230.    In accordance with the recommendations of both Sweet, and the Regional

Manager, Bower, late in the afternoon of October 5, 2009, Filo-Loos requested Dilley to prepare

a Final Written Warning for Rabassa relating to the fuel records.  Ex. 89 (LINCARE0001548).

Early in the morning of October 7, 2009, Dilley overrode Sweet, File-Loos and Bower's

recommendation and instructed them to fire Rabassa.  *Id.*  "Roberto needs to go," she wrote.  *Id.*

There is no evidence that Dilley personally reviewed the fuel and mileage logs, and

acknowledges that she never spoke with Rabassa about his explanation for the fuel

inconsistencies.  *See* Dilley Dep., at 151:5-10; 153:6-10; 159:1-11, Ex. 9.

231.    Dilley's order to terminate Rabassa was contrary to Lincare's usual HR

practices.  The usual practice is that HR staff at Lincare's corporate headquarters can recommend

disciplinary measures, but the operational managers make the final decision on what discipline

will be meted out.  *See* Dilley Dep., at 137:16-23, Ex. 9; Bower Dep., at 192:10-193:15, Ex. 5.

232.    One week after his phone call to Sheila Dilley complaining about Medicare fraud, Sweet fired Rabassa.  *See* Rabassa Dep., at 466:18-467:4, Ex. 32.  Although it was customary to prepare a "termination memo" for terminated employees, Dilley never prepared a termination memo for Rabassa.  *See* Dilley Dep., at 161:19-162:5, Ex. 9.

233.    Rabassa asked Sweet if he was being terminated because of his phone calls to Medicare and to Lincare's corporate offices reporting fraud.  Sweet nodded and indicated that it was precisely for that reason.  *See* Rabassa Dep., at 467:1-468:4, Ex. 32.

234.    Following his termination, Rabassa contacted Lincare's corporate offices in Florida to make an internal complaint of wrongful and retaliatory termination as required by Lincare's Problem Resolution Procedure.  Ex. 74 (ROBINSDUNLAP 0001056 at 18-19) (Lincare Employee Handbook); Rabassa Dep., at 478:2-20, Ex. 32.  After speaking with Dilley again, Rabassa was transferred to Jolanda Makey in Lincare's Compliance Department.  *Id*.  After voicing his complaints to Makey, she informed Rabassa that she would investigate his allegations of wrongful termination and get back to him.  Rabassa Dep., at 483:8-24, Ex. 32.  However, Makey never contacted Rabassa again.  Rabassa Dep., at 484:5-8, Ex. 32.  No appeal or review ever occurred.

235.    Shortly after Rabassa's termination, Deborah Dillon-Sarra investigated the alleged Medicare fraud perpetrated in the Marlborough center.  *See* Ex. 78 (Dillon-Sarra Dep., Ex. 6) (handwritten investigation notes).  Further, pursuant to Lincare's Problem Resolution Procedure, Rabassa's complaint that he had been wrongfully terminated was supposed to be reviewed by ["regional V.P. (or other appropriate manager)."  Ex. 74 (ROBINSDUNLAP

- 81 -

0001056 at 18-19) (Lincare Employee Handbook).  However, Rabassa was never contacted by Dillon-Sarra, or interviewed by any other Lincare investigator regarding his claims of fraudulent conduct or retaliatory discharge.  Rabassa Dep., at 504:21-505:2, Ex. 32.  Lincare's investigation substantiated Rabassa's allegations that capped Medicare customers received unnecessary portable cylinders.  *See* ¶ 128, *supra*.

236.    Upon being terminated, Rabassa lost his home, was evicted, and suffered emotional distress.  Rabassa Dep., at 515:16-516:6, Ex. 32.  Rabassa was unemployed for more than a year after he was wrongfully terminated by Lincare.  *See* Rabassa Decl. ¶ 22.

## LINCARE'S DATABASE INFORMATION

237.    In order to understand the information Lincare stores and uses on its information systems, Relators requested Lincare to produce a data dictionary.  *See* Ex. 50 (November 24, 2014 email from Michael Tabb to Lawrence Kraus). A data dictionary describes the information kept in the database fields used in an organization's information system; it documents what type of information is stored in the system and where it can be found. See Landrum Decl. ¶ 9. Without a data dictionary it is difficult for a third party to understand what information is stored on a database system and how it can be accessed. Almost all large database systems maintain a data dictionary.  *See id*. ¶¶ 10, 11.

238.    Lincare informed the Relators that Lincare does not maintain a data dictionary. *See* Ex. 51 (November 26, 2014 letter from Lawrence Kraus to Michael Tabb); Hermes Dep., at 227:3-228:22, Ex. 16.

239.     In order to obtain information about Lincare's billing for concentrators and capped portable oxygen, Lincare agreed to provide Relators current data on its information system responsive to two queries requested by the Relators.  One query sought portable oxygen tank delivery, claim, billing and payment records for customers on whose behalf Lincare had billed Medicare for portable oxygen content fills (the "Portable Oxygen" query). The second query sought claim, billing and payment records for Medicare (and other government payors) oxygen customers who stopped using oxygen, but for whose accounts Lincare continued to bill after oxygen reimbursement were supposed to have ended (the Concentrator Query").  *See* Ex. 54 (Queries).